[Crim. No. 1149. Second Appellate District, Division One.—January 8, 1925.]

## THE PEOPLE, Respondent, v. E. DREW CLARK, Appellant.

[1] CRIMINAL LAW — MURDER — PROOF OF DEATH — CIRCUMSTANTIAL EVIDENCE.—The general rule requiring either the production of the body of the person supposed to have been murdered, or some

---

1. Proof of *corpus delicti* in homicide, note, 68 L. R. A. 57, 73, 75, 76, 77, 78. See, also, 13 R. C. L. 737; 13 Cal. Jur. 677.

circumstance from which death would necessarily follow, cannot be applied in all cases; and if the circumstances surrounding the disappearance of the alleged victim be such as to convince the mind to a moral certainty as to his death, the demands of the law will be satisfied.

[2] ID.—CORPUS DELICTI—CRIMINAL AGENCY.—Nor is it necessary in establishing the *corpus delicti* that the means by or through which such death resulted be established beyond a reasonable doubt, the only requirement being that there be some evidence to justify the conclusion that criminal agency was the direct cause.

[3] ID.—SUFFICIENCY OF EVIDENCE—CONFESSIONS.—To justify a conviction of murder, the jury must be satisfied beyond a reasonable doubt of the existence of the very fact necessary to constitute the offense and to identify the defendant as the perpetrator; but it is not necessary that the evidence of the criminal act should be of that conclusive character in order to justify the admission of the defendant's confessions.

[4] ID.—CORPUS DELICTI—EVIDENCE.—In this prosecution for murder, although there was no direct evidence that the alleged victim was dead as established by the production of his dead body, or of the testimony of any witness of his own knowledge that the alleged victim was deceased, together with further proof that his death was brought about by criminal agency, the incriminating evidence produced at the trial was ample in quantity and quality to sustain the conclusion reached by the trial court that, independent of any confession or admissions made by defendant, the *corpus delicti* was established.

[5] ID.—ORDER OF PROOF—DISCRETION OF TRIAL COURT.—While it is recognized as better practice to establish the *corpus delicti* as early in the proceedings of the trial as may be practicable, the order of proof is discretionary with the trial court; and, where the *corpus delicti* is finally established, the error, if any, results in no prejudice to defendant's rights.

[6] ID.—OTHER CRIME—EVIDENCE.—If the evidence of another crime is necessary or pertinent to the proof of the one charged, the law will not thwart justice by excluding that evidence, simply because it involves the commission of another crime; and the fact that such evidence may appear to prejudice the defendant with the jury is no ground for its exclusion.

[7] ID.—INCRIMINATING REMARKS IN PRESENCE OF DEFENDANT—ABSENCE OF PREJUDICE.—In a criminal prosecution, statements of third persons are not admissible simply because they are made

2. See 13 R. C. L. 738.

6. Admissibility of evidence of other crimes in prosecution for murder, notes, 62 L. R. A. 200, 227, 278, 308, 320. See, also, 13 Cal. Jur. 703.

in the presence and in the hearing of the defendant, but they may be introduced in evidence if they are material as bearing upon conduct of the defendant; and any erroneous ruling in the admission of such statements cannot be said to have resulted in injury to the defendant, where such evidence is fully covered by other evidence which is unobjectionable.

[8] Id.—Res Gestae.—In a criminal prosecution, statements of third persons made in the presence and hearing of the defendant are admissible in evidence for the purpose of showing the defendant's attitude when incriminating statements were made in his presence; and such statements are likewise admissible where they are part of the *res gestae* of a material conversation in which the defendant joined.

[9] Id. — Motive for Crime — Sexual Intercourse with Wife of Victim.—In a prosecution for murder, evidence by the prosecution to the effect that after the disappearance of the alleged victim defendant and the wife of the alleged victim engaged with the other in acts of illicit sexual intercourse may be presented to the jury for the purpose of showing motive for the commission of the crime.

[10] Id.—Evidence—Statement of Fact by District Attorney—Misconduct.—In such a prosecution, prejudicial misconduct may not be predicated upon a statement of the district attorney in the presence of a jury, where it is apparent that such statement was not intended as any testimony in the case, but was simply an inadvertent comment, and there is ample evidence in the case which justifies the conclusion stated by the district attorney, and the statement is of a fact which is uncontradicted by any testimony, and apparently is conceded to be correct by opposing counsel.

[11] Id.—Expression of Opinion by Trial Judge—Instructions.—In this prosecution for murder, any slight error which inadvertently might have crept into the record because of some vague remark by the trial court with reference to certain disputed facts was cured by the court's instructions that the jury was the exclusive judge of the facts of the case and that the expression of any opinion thereon by the judge was to be disregarded.

[12] Id.—Orderly Cross-examination—Discretion of Trial Court. In such a prosecution, it cannot be said that any harm resulted to defendant by reason of the action of the trial court in re-

---

8. Admissibility in evidence of undenied accusation of crime, notes, 4 Ann. Cas. 1042; 12 Ann. Cas. 875; Ann. Cas. 1913C, 840. See, also, 8 Cal. Jur. 103.

9. Admissibility of evidence of other crimes to show motive for homicide, note, 7 Ann. Cas. 67.

fusing defendant permission to cross-examine a certain witness regarding the condition of certain checks and their whereabouts prior to their being introduced in court, before said witness had finished his testimony on direct examination, where the subsequent cross-examination fails to disclose anything of a prejudicial nature to defendant's rights in the premises by reason of the action of the court in delaying the cross-examination until in the ordinary course of procedure such time had properly arrived.

[13] ID.—POSTPONEMENT OF CROSS-EXAMINATION — DISCRETION. — The order of proof being within the discretion of the trial court, in the absence of abuse of such discretion, error cannot be predicated upon the action of the trial court, in a prosecution for murder, in denying defendant's request that the cross-examination by defendant of a certain witness be ·postponed until "after the evidence of the *corpus delicti* has been established."

[14] ID.—.ADMISSIONS—CORPUS DELICTI.—In a prosecution for murder, the *corpus delicti* must be established without the aid of any admission by the defendant.

[15] ID. — EVIDENCE — MURDERER AS WITNESS. — Under sections 1879, 1880, and 1881 of the Code of Civil Procedure, a person is competent to testify, notwithstanding he has been found guilty of murder and at the time he gives his testimony he is under sentence of death.

---

(1) 30 C. J., p. 285, n. 44, p. 286, n. 48.    (2) 30 C. J., p. 287, n. 64 New.    (3) 16 C. J., p. 737, n. 52, p. 865, n. 88, 30 C. J., p. 296, n. 19.    (4) 30 C. J., p. 285, n. 45.    (5) 16 C. J., p. 865, n. 89, 90; 17 C. J., p. 306, n. 33; 30 C. J., p. 150, n. 7, 8 New. (6) 16 C. J., p. 588, n. 8.    (7) 16 C. J., p. 642, n. 35, 37 New; 17 C. J., p. 321, n. 47.    (8) 16 C. J., p. 579, n. 98, p. 643, n. 49 New. (9) 30 C. J., p. 186, n. 12, 17.    (10) 16 C. J., p. 897, n. 87.    (11) 16 C. J., p. 828, n. 27.    (12) 17 C. J., p. 303, n. 83.    (13) 16 C. J., p. 864, n. 80; 17 C. J., p. 244, n. 65 New.    (14) 30 C. J., p. 150, n. 3 New.    (15) 40 Cyc., p. 2207, n. 1.

APPEAL from a judgment of the Superior Court of San Diego County and from an order denying a new trial.    E. A. Luce, Judge.    Affirmed.

The facts are stated in the opinion of the court.

Shreve, Dorn & Shreve & Tyler for Appellant.

---

14.    See 13 R. C. L. 739; 13 Cal. Jur. 678.

U. S. Webb, Attorney-General, John W. Maltman, Deputy Attorney-General, Chester C. Kempley, District Attorney, and C. G. Selleck, Assistant District Attorney, for Respondent.

HOUSER, J.—Defendant was convicted of murdering one George E. Schick, a human being, and in accordance with the recommendation of the jury which rendered the verdict, was sentenced to the state prison for the term of his natural life. From the judgment of conviction and the order denying his motion for a new trial defendant appeals to this court.

The evidence adduced on the trial of the case warranted the jury in believing that the following facts, among others, were true: That Mr. and Mrs. George E. Schick were married in 1913; that in the fall of 1922 they went to live in the city of San Diego, California; that two children were born of the marriage of Mr. and Mrs. Schick, and at the time of the trial of the action such children were aged respectively four and seven years; that with the exception of two occasions averaging about three or four weeks each, Mr. and Mrs. Schick were never separated one from the other during their married life; that during each of such separations Mrs. Schick heard from Mr. Schick nearly every day; that within a very short time after Mr. and Mrs. Schick arrived in San Diego, Mr. Schick purchased a house and lot; that near the end of the month of October, 1922, Mr. and Mrs. Schick became acquainted with defendant and the wife of defendant, who thereupon became frequent visitors at the Schick residence, often dining with the Schicks and on many occasions remaining at the Schick home overnight; that the Schicks resided in a suburb of San Diego known as Kensington Park; that in the month of November, 1922, Mr. Schick purchased another house and lot, which is known as the Mission Drive house, and shortly after the first of the year 1923 defendant and Mrs. Clark moved into the Mission Drive house where, without paying any rent therefor, they continued to reside until the day of Mr. Schick's disappearance; that during the fall of 1922 Mr. Schick purchased a real estate business, also a millinery shop; that Mr. Schick was in the habit of making statements to the effect that he was a man of considerable financial means;

that sometime prior to the seventh day of February, 1923, Mr. Schick had lent to defendant the sum of $400 and had taken defendant's note for the same.

On the morning of February 7, 1923, Mr. Schick left his home as usual. At that time some conversation occurred between him and Mrs. Schick relative to Mr. Schick's going to South America, but for years prior thereto Mr. Schick had talked of removing to South America and on that particular morning said nothing which would indicate that he would leave for South America on that day. To quote Mrs. Schick's testimony: "He said if I would say that I would go down, that he would sell out all the property and we would all go down there any time that I would say that I would go." That was the last time Mrs. Schick ever saw or heard from her husband. After Mr. Schick's arrival in California in the fall of 1922, and up to the seventh day of February, 1923, he wrote regularly each week to his mother in the east. After the seventh day of February, 1923, Mr. Schick's mother received no letter from him. On the day following Mr. Schick's disappearance he had a business engagement of considerable importance, but which engagement he failed to keep.

On the afternoon of February 7, 1923, defendant called Mrs. Schick on the phone and stated that Mr. Schick had been called out of the town and that he (defendant) would come to the Schick home that evening and tell her all about it. About 8 o'clock that evening defendant and his wife arrived at the Schick residence in the Studebaker automobile which had been owned and driven by Mr. Schick and which he had driven away from his home on the morning of that day.

Upon his arrival defendant told Mrs. Schick of the circumstances surrounding the alleged departure of her husband, stating to Mrs. Schick that her husband had been "tipped off" that morning at the bank that detectives were after him on account of some financial difficulties in the east; that Mr. Schick had gotten hold of a Russian from Los Angeles and had departed in a red Stutz car belonging to the Russian; that Mr. Schick had furnished the money for the trip and the Russian had furnished the automobile; that they had equipped themselves with khaki clothes and ammunition, but that Mr. Schick had been afraid to go to the

bank for funds; that, therefore, he (defendant) had given
Mr. Schick $5,000 in sugar bonds, and that Mr. Schick had
sent word to Mrs. Schick that she was to go to the safe
deposit box and pay defendant out of the government
bonds. Defendant at that time gave Mrs. Schick the keys
to the safe deposit box and to the Studebaker automobile,
stating that Mr. Schick had directed him so to do. The de-
fendant further states that Mr. Schick, before his departure,
had torn up the $400 note given him previously by defend-
ant, and that Mr. Schick had left instructions to Mrs. Schick
to sell the property, and for all of them to live together;
that he, Mr. Schick, was going into Mexico, and from there
to South America; that Mrs. Schick should not let anyone
know which way he had gone; that Mrs. Schick would not
hear from him for three months; that he was going into
business down there and would send for Mrs. Schick. De-
fendant at that time further stated that Mr. Schick had told
him that Mrs. Schick would be the first one to turn yellow
and tell people which way he had gone, so that detectives
could get him.

From the time the Clarks commenced to live in the Mis-
sion Drive house, which was at least a month previous to
Schick's disappearance, the Clarks never remained all night
at the Schick home until the night of the 7th of February;
they remained at the Schick home that night and never spent
another night in the Mission Drive house where they had
been living.

When Mrs. Schick awakened the morning of the 8th of
February, 1923, about 9 o'clock, defendant was absent from
the house; he returned later in the forenoon.

During the month of January, 1923, defendant had in-
duced Mr. Schick to transfer to Mrs. Schick the title to
the two houses which he owned in the city of San Diego.
Almost immediately following Mr. Schick's disappearance,
to wit, on the eighth or ninth day of February, 1923, de-
fendant, Mrs. Clark, and Mrs. Schick removed some papers
and bank-books from Mr. Schick's safe deposit box. Ad-
mission to the box was secured through a letter purporting
to have been written and signed by Mr. Schick, but which
in reality bore his forged signature, which forgery had been
perpetrated by Mrs. Schick at defendant's suggestion and
with his co-operation therein. Very soon thereafter defend-

ant also induced Mrs. Schick to forge Mr. Schick's signature to a general power of attorney, as well as to several letters written to various banks in the east, requesting the payment to Mr. Schick of balances of accounts in such banks. Among the keys belonging to Mr. Schick, which were given to Mrs. Schick by defendant on the night of Mr. Schick's disappearance, were safe deposit box keys which defendant stated he believed were on some bank in the east. Those keys were likewise sent to the bank enclosed in letters with the signature of George E. Schick forged on them by Mrs. Schick at defendant's solicitation and request. A few days following Mr. Schick's disappearance defendant purchased a new Hupmobile. Prior thereto, defendant had not been the owner of an automobile. At the time defendant purchased the automobile he secured from Mrs. Schick the sum of $4,000 in the following manner: $750 credit was allowed for the automobile belonging to Mr. Schick and which was taken in part exchange on the Hupmobile; $400 credit for a promissory note owed by defendant to Mr. Schick and which defendant stated to Mrs. Schick had been destroyed by Mr. Schick on the day of his disappearance, and the balance in cash. The $4,000 was for the purported purpose of paying defendant for certain bonds which he claimed to have given Mr. Schick on the day of his disappearance. Shortly after Mr. Schick disappeared, defendant stated that it would be necessary to tell the story that Mr. Schick had been back to his home two or three times in order to fit the dates of the various papers on which Mr. Schick's signature had been forged. Later defendant told Mrs. Schick that because of her pregnant condition it would be necessary to state that Mr. Schick had been back to his home on the 23d of April. Mrs. Schick and defendant had engaged in illicit sexual relations with each other, beginning in November, prior to Mr. Schick's disappearance in the following February, which relations continued up to and after Mr. Schick disappeared. About two months after Mr. Schick's disappearance defendant asked Mrs. Schick to make a will in his favor, naming him trustee of the estate and guardian of Mrs. Schick's children. At the same time he also requested her to turn over her money to him in order that he might go into business; that he (defendant) could not make any money if she did not give him a freer hand with the funds. In July, 1923, de-

fendant and Mrs. Schick removed from the city of San Diego to the city of El Cajon and took the two Schick children with them—Mrs. Clark taking an apartment in San Diego, but occasionally spending days at El Cajon. At about the same time Mrs. Schick turned over to defendant a $1,000 Liberty bond and several smaller amounts in cash, totaling several hundred dollars. In August, 1923, defendant requested Mrs. Schick to give him $3,000, stating that unless she would turn over more money to him he would have to leave and get a position elsewhere. A short time after the disappearance of Mr. Schick defendant stated to Mrs. Schick that he had a clairvoyant vision in which he saw Mr. Schick killed in Mexico, full details of the vision being narrated. On numerous occasions thereafter defendant insisted that he knew this vision was true.

In a conversation in July, 1923, when the question of giving out information as to the fact that Mr. Schick had disappeared was under discussion, defendant stated that Mrs. Schick would have to give out the fact that some man had told her of the manner in which Mr. Schick came to his death; that the world would not believe in a clairvoyant vision; and that in telling this story Mrs. Schick was to be the only one who had seen the man who had communicated to her the manner of Schick's death. In conformity with this story, defendant dictated a letter which Mrs. Schick signed and sent to the department of justice setting forth the same facts occurring in defendant's alleged vision except that it was stated that a certain man, whose name was Peter Hawkins, had witnessed the occurrence and had brought the news to Mrs. Schick. This letter was sent to the department of justice after an effort had been made to collect insurance. In the attempt to collect this insurance, Mr. Atkinson, local representative of the insurance company, was called out to the home in El Cajon and the story of Mr. Schick's disappearance told to him. This story was told by both the defendant and Mrs. Schick, and agreed with defendant's alleged vision, except, also, in this instance claim was made that the news of Mr. Schick's death had been brought by one Peter Hawkins.

Defendant and Mrs. Schick learned from a clipping in an eastern newspaper, which was sent to Mrs. Schick, that detectives were working on the disappearance of Mr. Schick,

and that Mr. Schick's brother, Martin Schick, was coming to California. Upon learning that Martin Schick was coming to California to investigate regarding the absence of George E. Schick, defendant stated to Mrs. Schick that the first thing Martin Schick would do would be to try to implicate defendant in the disappearance of George E. Schick, but that no one could arrest defendant or charge him with anything until the body of George E. Schick had been found, and that if they would all "stick to the same story" and give the same dates on which Mr. Schick was supposed to have returned, there could be no trouble. Within a very few days after the disappearance of George E. Schick, defendant appeared in possession and claimed to be the owner of a watch formerly owned by George E. Schick, which had been given to him by his father; a Shrine emblem worn by Schick, which had been given to him by his wife; and a 32d degree Masonic diamond ring owned and worn by Schick. Immediately thereafter defendant had each of such articles altered so that none of them could be recognized. Defendant made statements to the effect that he had received these various articles through inheritance from his father. Defendant also appropriated to his own use some of Mr. Schick's neckties and silk hose. On the night of the day on which Mr. Schick disappeared, a commotion occurred in the house occupied by defendant, in which loud voices of two men and unusual noises, such as chairs being knocked over, were heard, and which noises suddenly ceased. The next day, or shortly thereafter, there was a fire in the rear of the house in which defendant resided, kindled underneath an oil drum, of the size eighteen inches in diameter and thirty inches tall, which gave off a most offensive odor like burning of bones or eggshells. Prior to that time defendant had never burned anything in that manner at that place. The Clarks never remained in that house another night, although for a month thereafter defendant visited the house nearly every day, twice in company with his wife, who on each of such occasions remained outside. The house was in an out-of-the-way place. On the second morning after the seventh day of February, which was the date of the disappearance of Mr. Schick, defendant was seen in a lonely canyon, and shortly thereafter went to a garage, his automobile covered with red adobe mud and brush. The shift fork of the automobile

had been bent so that the automobile could be driven only in low gear or in reverse. The clutch had been burned out from slipping or pulling.

In addition to the foregoing, there was evidence of many admissions made by defendant to officers, among which were statements that he could not be convicted of murder unless they could find the body. Also the testimony of a witness detailing a confession made to him by defendant. There was other evidence in the record which favored defendant's innocence.

The principal point relied upon by appellant for reversal of the judgment is that the *corpus delicti* was not established.

Appellant contends that the elements of the *corpus delicti* in the charge against defendant necessitated either direct evidence that Schick was dead as established by the production of his dead body, or of the testimony of at least one witness of his own knowledge that Schick was deceased, together with further proof that Schick's death was brought about by criminal agency. Many authorities are cited to support such contention. They are, however, either general in their nature, or based upon a state of facts which make such a rule in all its strictness inapplicable to the facts in the instant case. Where cases are found which in their facts are analogous to those as shown by the evidence introduced on the trial of the present case, the general rule is greatly relaxed. A few illustrations will suffice for the purpose of demonstrating the attitude of the courts.

In the case of *State* v. *Williams* (1905), 46 Or. 287 [80 Pac. 655], the defendant was convicted of murder. The body of the victim was never found, nor was there testimony of any eye-witness to any act of violence upon the person alleged to have been murdered. The incriminating facts were purely circumstantial, and while weak in character, pointed not only to the commission of the crime, but as well to the defendant's participation therein. With reference to the necessity of proving by direct evidence the fact of death of the supposed victim, the court reviewed many decisions on the subject, and in discussing the matter, among other things, said:

"To require direct proof of the killing or the production of the body of the alleged victim in all cases of homicide

would be manifestly unreasonable, and lead to absurdity and injustice; and it is believed that it is now clearly established by the authorities that the fact of the death as well as the guilt of the defendant may be legally inferred from such strong and unequivocal circumstances as produce conviction to a moral certainty. . . . The strict rule contended for by defendant would operate completely to shield a criminal from punishment for the most atrocious crime, and afford him absolute immunity if he were cunning enough to consume or destroy the body of his victim by fire or some chemical agency, or completely hide it away or otherwise destroy its identity, although the proof of his guilt might be of the most clear and convincing kind, and remove all possible doubt in the premises. . . . Where, as here, the entire circumstances point with one accord to the death of the person alleged to have been murdered, the finding of fragments of a human body or of metallic articles which are positively identified as part of the body of the alleged victim, or as articles worn by him, will be sufficient, if believed by the jury, to establish the fact of death, when this is the best evidence that can be obtained under the circumstances (citing cases). No universal and unvariable rule can be laid down in regard to the proof of the *corpus delicti*. Each case depends upon its own peculiar circumstances. The body of the crime may be proved by the best evidence which is capable of being adduced, if it is sufficient for the purpose. Such an amount of accompanying or relative facts, whether direct or circumstantial, must be produced as establish the fact beyond a moral certainty, and to the exclusion of every other reasonable hypothesis.''

The case of *United States* v. *Williams*, reported in 28 Fed. Cas. 636 (No. 16,707), presents a state of facts which, without the aid of a confession, resemble the case last cited in that there was no discovery of the body of the victim of the murder; nor was there any direct evidence that a murder had been committed. It was a case of apparent mutiny on board a brig; the murder of the master and mates thereof; abandonment of the brig by the assassins in a small boat; their subsequent rescue in the open sea by another vessel; their possession of the brig's compass, register, water, and provisions, besides certain articles of a personal nature, such as a watch and clothing which belonged to the master

and to the first and second mates. On the phase of the case regarding the requirement of absolute proof of death, the court said, in part: ''Cases, however, have occurred, and it is greatly to be feared may hereafter occur, where the application of this rule would secure impunity to the murderer, and therefore would be unreasonable, as it would be in the highest degree prejudicial to the court of criminal justice. A murderer would only have to consume the body by fire, or decompose it by chemical means, or sink it in the depth of the sea, and the laws of society would be powerless to punish the offender.''

Speaking to the question of the necessity of production of proof of death, Judge Story, in *United States* v. *Gibert,* 25 Fed. Cas. 1287 (No. 15,204), made the following statement: ''The first proposition (that there ought to be no conviction for murder unless the murdered body is actually found) certainly cannot be admitted as correct in point of common reason, or of law, unless courts of justice are to establish a positive rule to screen persons from punishment, who may be guilty of the most flagitious crimes. In the cases of murders committed on the high seas, the body is rarely if ever found; and a more complete encouragement and protection for the worst offenses of this sort could not be invented, than a rule of this strictness. It would amount to a universal condonation of all murders committed on the high seas.''

In the case of *State* v. *Lamb,* 28 Mo. 218, where the defendant had confessed to the murder of his wife by drowning her in the Mississippi River the court said: ''Although the dead body has not been found, and although no witness swore that he saw the perpetration of the murder, yet the circumstances extrinsic to the confession, and established by other evidence, are so strong that they cannot fail to satisfy any unbiased mind that the accused is guilty of the crime of which he has been convicted. We consider the true rule, as deduced from the current of authorities, to be, that an extrajudicial confession, with extrinsic circumstantial evidence satisfying the minds of a jury beyond a reasonable doubt that the crime has been committed, will warrant a conviction, although the dead body has not been discovered and seen, so that its existence and identity can be testified to by an eye-witness.''

It is said in the case of *People* v. *Alviso*, 55 Cal. 230, 233, that: "It is very seldom that a conviction occurs without positive proof of the former (death), either by eye-witnesses of the homicide, or the subsequent discovery of the body; and while the general rule is clearly laid down, yet the authorities concede that there may be exceptions. Thus, Wharton, in his work on Homicide, section 637, relates instances of the human body being disposed of by fire, or boiled in potash, or dissolved in acids, rendering it impossible that it should ever be produced; and concludes: 'It is clear that in such cases the *corpus delicti* may be proved circumstantially or inferentially.'"

[1] From a reading of the cases to which reference has been had, as well as to other authorities which might be cited, it is clear that the general rule requiring either the production of the body of the person supposed to have been murdered, or some circumstance from which death would necessarily follow, cannot be applied in all cases. If the circumstances surrounding the disappearance of the alleged victim be such as to convince the mind to a moral certainty as to his death, the demands of the law will be satisfied. [2] Nor is it necessary in establishing the *corpus delicti* that the means by or through which such death resulted be established beyond a reasonable doubt. The only requirement is that there be some evidence to justify the conclusion that criminal agency was the direct cause. The case of *People* v. *Jones*, 123 Cal. 65 [55 Pac. 698], is authority for the statement that: [3] "To justify a conviction, the jury must be satisfied beyond a reasonable doubt of the existence of every fact necessary to constitute the offense and to identify the defendant as the perpetrator; but it is not necessary that the evidence of the criminal act should be of that conclusive character in order to justify the admission of the defendant's confessions." Which language, as we understand it, is to be taken in connection with the laying of a foundation for the admission of a confession.

It is said in *People* v. *Alba*, 52 Cal. App. 603 [199 Pac. 894], that: "(Syllabus) It is not required that the *corpus delicti* be established beyond a reasonable doubt, but it is sufficient if there is some evidence tending to establish a criminal agency as the cause of the facts forming its basis."

And in *People* v. *Wagner*, 29 Cal. App. 366 [155 Pac. 651], the following language is pertinent to the question of the amount of evidence required regarding the criminal character of the act in question: "Proof of the *corpus delicti* of the conclusive and convincing character required to support a conviction of the crime charged was not a prerequisite to the reception in evidence of the extrajudicial statements of the defendant that he killed the deceased. (*People* v. *Vertrees*, 169 Cal. 404 [146 Pac. 890]; *People* v. *Rowland*, 12 Cal. App. 6 [106 Pac. 428]; *People* v. *Spencer*, 16 Cal. App. 756 (117 Pac. 1039].)"

That the *corpus delicti* need not be proven beyond a reasonable doubt before the admissions of the confession of the defendant may be received in evidence, see *United States* v. *Williams*, 28 Fed. Cas. 636 (No. 16,707); *People* v. *Hatch*, 13 Cal. App. 531 [109 Pac. 1097]; *People* v. *Rowland*, 12 Cal. App. 10 [106 Pac. 428].

In addition to the authorities which have already been cited herein, the following cases will illustrate the rule that the *corpus delicti* may be established by circumstantial evidence, to wit: *People* v. *Wilkins*, 158 Cal. 530 [111 Pac. 612]; *People* v. *Wilkison*, 30 Cal. App. 473 [158 Pac. 1067]; *People* v. *Spencer*, 16 Cal. App. 756 [117 Pac. 1039].

In the case of *People* v. *Wilkins, supra*, quoting from 3 Rice on Evidence, 465, 466, it is said: "Nor is it necessary that the *corpus delicti* should be proved by direct and positive evidence. It would be most unreasonable to require such evidence. Crimes, and especially those of the worst kinds, are naturally committed at chosen times, and in darkness and secrecy; and human tribunals must act upon such indications as the circumstances of the case present or admit, or society must be broken up. Nor is it very often that adequate evidence is not afforded by the attendant and surrounding facts, to remove all mystery and to afford such a reasonable degree of certainty as men are daily accustomed to regard as sufficient in the most important concerns of life; to expect more would be equally needless and absurd."

[4] Without again attempting to repeat the substance of the incriminating evidence, exclusive of defendant's admissions, adduced on the trial, we are content to hold that it was ample in quantity and quality to sustain the conclusion reached by the trial court that, independent of any confes-

70 Cal. App.—35

sion or admissions made by defendant, the *corpus delicti* was established.

Appellant's brief contains many specifications of error dependent upon the rulings of the trial court either in admitting or in rejecting certain testimony. Nearly all of them which have to do with the admission of testimony over defendant's objections relate to the state of the evidence at the time of the reception of the evidence in question, that is, that the *corpus delicti* had not been established. **[5]** While it is recognized as better practice to establish the *corpus delicti* as early in the proceedings of the trial as may be practicable, it is well settled that the order of proof is discretionary with the court; and where, as in the instant case, the *corpus delicti* was finally established, the error, if any, resulted in no prejudice to defendant's rights. (*People* v. *Wilkins,* 158 Cal. 530 [111 Pac. 612].)

One of appellant's objections to the admission of evidence by the trial court was occasioned by Mrs. Schick's testimony to the effect that, at defendant's suggestion and request, and with his active co-operation, she forged the name of George E. Schick to several different documents. It is contended that because such evidence tended to prove the commission by defendant of an independent offense and was calculated to prejudice defendant in the minds of the jury, the objections thereto should have been sustained. **[6]** By many decisions of the courts of this state, it is declared to be the law that "if the evidence of another crime is necessary or pertinent to the proof of the one charged, the law will not thwart justice by excluding that evidence, simply because it involves the commission of another crime." (*People* v. *Sanders,* 114 Cal. 230 [46 Pac. 157].) And see *People* v. *Klopfer,* 61 Cal. App. 291 [214 Pac. 878], where cases bearing on the subject are cited, and where the rule is said to be that "where the evidence tending to prove such independent offense also tends to prove a fact material to the commission of the offense charged, such evidence is admissible; and the fact that such evidence may appear to prejudice the defendant with the jury is no ground for its exclusion."

Certain testimony was admitted by the court over defendant's objections regarding statements made by other persons in the presence of defendant. **[7]** While it is the rule that such statements are not admissible simply because they

are made in the presence and in the hearing of the accused, it is also true that if such statements are material as bearing upon conduct of the defendant, in such circumstances they may be introduced in evidence. (*People* v. *Weber,* 149 Cal. 325, 338 [86 Pac. 671] ; 8 Cal. Jur., sec. 196, and cases therein cited.) With so much in mind, but considering the further fact that much of the evidence to which objection was made was fully covered by other evidence which was unobjectionable, it cannot be said that any injury resulted to defendant by reason of any erroneous ruling of the court (assuming it to be such) to which attention is directed. **[8]** As to that part thereof not covered by other evidence which was properly admitted, it need only be said that it comes within the rule which permits such evidence for the purpose of showing defendant's attitude when incriminating statements are made against him in his presence; also as part of the *res gestae* of a material conversation in which defendant joined.

**[9]** On the trial of the case defendant objected to the introduction of evidence by the prosecution to the effect that after the disappearance of George E. Schick defendant and Mrs. Schick engaged one with the other in acts of illicit sexual intercourse. The objection was overruled by the court and such ruling is assigned as error. In the prosecution of an offense of the nature of that before the court it is universally conceded that evidence of acts or conduct of the defendant showing motive for the commission of the crime may be presented to the jury. In the instant case, in view of such testimony, it would seem unnecessary to look for a motive in defendant in the doing away with Schick other than to be free from the possible fear of detection by the husband of the relations sustained by defendant with Schick's wife. The evidence was clearly admissible.

**[10]** Complaint is made of a certain remark made by the district attorney in the presence of the jury. It is apparent that the statement by the district attorney was not intended as any testimony in the case, but was simply an inadvertent comment. There was ample evidence in the case which justified the conclusion stated by the district attorney, and while not ordinarily permissible practice for an attorney in the course of the trial outside of argument, to comment upon the evidence, the statement to which objection is made was

a fact which, so far as the attention of the court has been directed, was uncontradicted by any testimony, and apparently was conceded to be correct. In such circumstances, no prejudicial injury resulted to defendant.

[11] It is urged that during the trial the court was guilty of misconduct in that on two or three occasions the judge made certain remarks in the presence of the jury from which the jury might have inferred that the judge was of the opinion that the evidence showed the existence of certain disputed facts, such, for example, as the death of George E. Schick. An examination of the transcript of the proceedings to which attention has been directed fails to disclose any clear violation of the rule which forbids any expression of opinion by the judge on the effect or the value of the evidence. Furthermore, instructions given by the court to the jury, emphasized the rule that the jury was the exclusive judge of the facts of the case and that the expression of any opinion thereon by the judge was to be disregarded by the jury. It would therefore follow that any slight error which inadvertently might have crept into the record because of some vague remark by the court was cured by the court's instructions to which reference has just been had.

[12] Appellant further complains because, before a certain witness had finished his testimony on direct examination, the court refused defendant permission to "cross-examine" such witness regarding the condition of certain checks and their whereabouts prior to their being produced in court. Even assuming the existence of such a right as is the basis of defendant's contention, in view of the fact that subsequent cross-examination failed to disclose anything of a prejudicial nature to defendant's rights in the premises by reason of the action of the court in delaying the cross-examination until in the ordinary course of procedure such time had properly arrived, it cannot be said that any harm resulted to defendant.

[13] During the early part of the trial defendant requested of the court that the cross-examination by defendant of a witness be postponed until "after the evidence of the *corpus delicti* has been established." The request was denied and error is predicated thereon. It is a well-settled rule of procedure that such matters rest within the discre-

tion of the trial court. No abuse of such discretion can be reasonably said to exist in the action of the trial court in the instance to which we have adverted, and in such circumstances it must be held that no error was committed in connection therewith.

[14] It is objected by appellant that within the evidence going to make up the *corpus delicti* there are certain admissions made by defendant; and the point is advanced that the rule forbidding the introduction in evidence of a confession by a defendant until after the *corpus delicti* has been established should operate in a similar way to the exclusion of an admission. The California cases seem to uphold appellant in his contention to the effect that the *corpus delicti* must be established without the aid of any admission by a defendant. (*People* v. *Simonsen,* 107 Cal. 345 [40 Pac. 440]; *People* v. *Tapia,* 131 Cal. 647 [63 Pac. 1001]; *People* v. *Ward,* 145 Cal. 736 [79 Pac. 448]; *People* v. *Besold,* 154 Cal. 368 [97 Pac. 871].)

The admission made by defendant, to which most importance is attached, is that in which he is credited with stating in effect that there could be no conviction of a person charged with murder unless and until the dead body of the supposed victim was discovered. But if we are to be guided by precedents, as announced in adjudications in analogous cases, every admission made by defendant herein may be excluded and there will still remain in the record ample evidence to justify the jury in its determination of the fact that Schick was dead and that his death was caused by criminal agency. In no one of the several cases herein cited, on the point that no absolute necessity exists for the actual discovery of the dead body of the victim in order that the *corpus delicti* may be established, were the incriminating facts against the defendant of greater strength than the facts against this defendant (exclusive of his admissions), as hereinbefore set forth, and yet they were held sufficient. Take, for example, the following facts as narrated in the case of *United States* v. *Williams,* 28 Fed. Cas. 636 (No. 16,707); "Many facts and circumstances were proved at the trial, independently of the confessions, tending to show that the crime had been committed; and some of the circumstances

thus proved were of a character strongly to implicate the prisoners in the transaction. It was proved that the prisoners left Portland on the 7th of July, 1857, in the same vessel with Quinton D. Smith and the other men supposed to have been murdered, and that neither Smith, the other men, or the vessel have ever since been seen or heard from except through the confessions of the prisoners and of Lahey, who died before the trial. Neither the vessel nor the officers or men ever arrived at the port of destination or returned to the home port. At the time, or about the time, when the vessel should have arrived at Cardenas, the prisoners were picked up in a boat in the open sea, which boat was subsequently brought home and identified, and proved to be the only boat of the vessel in which they sailed. It was tarred inside in a manner to indicate that they had not left the vessel without preparation, and that fact was still more strongly indicated by the circumstances that they had in the boat the ship's compass, and a supply of water and provisions. They had in their possession also the watch of the captain, and the clothing of the murdered men, and all these articles were fully identified at the trial, as was the ship's register, which was also in their possession. After they were picked up, they gave contradictory and false accounts of what had occurred before they left the vessel, and persisted in the falsehood until Lahey disclosed the truth; and when they saw that detection was certain, they freely and voluntarily confessed their crimes. All these facts and circumstances were fully proved at the trial before the confessions were admitted, and we think they were of a character to be regarded as tending to prove, not only that the crime had been committed, but that it had been committed by the prisoners."

In the case of *State* v. *Lamb*, 28 Mo. 218, aside from the confession of the defendant, the evidence was most meager—immeasurably weaker than the evidence adduced in the instant case—notwithstanding which fact the evidence was held sufficient to uphold the verdict.

[15] Near the close of the case, as presented by the prosecution, a witness by the name of Hendrix testified in detail to a confession made to him by defendant. Before the witness was sworn defendant objected "to this person being

sworn in this courtroom for the reason that he is incompetent to testify in the court, based upon this: that the oath administered is such an oath as would tend to cause a witness to speak the truth, and this, that he is immune from punishment for perjury, and also that he is in effect immune from contempt of court, and that there is no oath that can be administered to him that would cover those points.'' The objection was overruled. A motion to strike from the record all the testimony of the witness on the ground that he was incompetent to testify for the reason that theretofore he has been found guilty of murder and at the time he gave his testimony was under sentence of death was denied by the court. Such rulings are assigned as prejudicial error.

Appellant cites no authority in support of his contention.

Section 1879 of the Code of Civil Procedure provides: ''All persons, without exception, otherwise than is specified in the next two sections, who, having organs of sense, can perceive, and, perceiving, can make known their perceptions to others, may be witnesses. Therefore, neither parties nor other persons who have an interest in the event of an action or proceeding are excluded; nor those who have been convicted of crime; nor persons on account of their opinions on matters of religious belief; although, in every case, the credibility of the witness may be drawn in question, as provided in section eighteen hundred and forty-seven.''

Sections 1880 and 1881 of the Code of Civil Procedure, aside from covering privileged communications by which certain persons are precluded from giving their testimony, relate to persons of unsound mind, children, and parties in actions against executors and administrators. It would therefore appear that by the express provisions of the statutes the witness was competent to testify.

Other specifications of error regarding either the admission or the rejection of evidence are either not seriously pressed by appellant, or are of so little comparative consequence that no discussion thereon is deemed necessary. Suffice it to say that each of them has received consideration, but that in the judgment of this court none of them is of that importance which would justify either the space or the time in indicating a specific ruling thereon.

The judgment and the order denying defendant's motion for a new trial are affirmed.

Conrey, P. J., and Curtis, J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on March 9, 1925.

All the Justices concurred.