[Crim. No. 2064.  First Appellate District, Division One.—March 31, 1941.]

THE PEOPLE, Plaintiff and Respondent, v. SHIRLEY KAYE et al., Appellants.

Gerald J. Kenny, Public Defender, James A. Toner, Assistant Public Defender, Nathan C. Coghlan and Alfred J. Hennessy for Appellants.

Earl Warren, Attorney-General, and William F. Cleary, Deputy Attorney-General, for Respondent.

PETERS, P. J.—The four appellants, Laura Bonzani, Shirley Kaye, Nicholas Cirimele, and Patrick Pettingill (*alias* Pat Kelly), together with one William McCord were jointly charged by indictment with three offenses; (1) the murder of Donald Maycock; (2) the robbery of Donald Maycock; and (3) the robbery of Joseph Sankus. Over the objections of defendant Bonzani the five defendants were jointly tried. The four appellants were all convicted of the murder and the robbery of Maycock, and Kaye, Cirimele and Pettingill were convicted of the robbery of Sankus. Bonzani was acquitted on this charge. What happened to defendant McCord does not appear, and is not important, inasmuch as he has not appealed. The jury, in each instance, found the murder to have been in the first degree, and fixed life imprisonment as the penalty. The two robberies were found to be in the second degree. The four appellants appeal from the judgments pronounced in accord with the verdicts, and from the order denying their motions for a new trial.

All appellants contend that the evidence was insufficient, as a matter of law, to warrant the convictions of any of them; that there was not sufficient evidence, independent of the extrajudicial statements of the defendants, to establish the *corpus delicti* of any of the offenses charged; that the evidence shows that defendant Pettingill struck Maycock in self-defense; that evidence of another offense was improperly admitted. Appellant Kaye contends that the evidence was insufficient to warrant her conviction of either the murder or robbery of Maycock, she admittedly not being present when those offenses were committed. It is further contended in her behalf that there is no evidence that she participated in the robbery of Sankus. Appellant Bonzani urges that the evidence as to her is insufficient to warrant her conviction of either the murder or robbery of Maycock, in that, although she was present, there was no evidence that she was a mem-

ber of the conspiracy to rob Maycock. She also urges that it was error to deny her motion for a separate trial.

It was the theory of the prosecution, as disclosed by the opening statement of the district attorney, that the five defendants entered into a conspiracy to rob men who were under the influence of liquor; that the plan was that Kaye and Bonzani should visit bars and taverns unescorted and permit themselves to be "picked up" by men who had money and were under the influence of liquor; that after finding such prospects they were to telephone the male defendants, who would take the victims to a lonely spot and slug and rob them; that the crimes here involved were committed as part of that conspiracy.

Each of the defendants made a statement to the police, and each defendant, with the exception of McCord, took the stand in his or her own defense. After reading the record, although it must be conceded that in some respects the evidence is not as satisfactory as to some phases of the case as might be desired, we are convinced that the appellants were fairly tried, and that the evidence supports the judgments.

The first question presented is whether the prosecution established the *corpus delicti* sufficiently to have authorized the court to have admitted in evidence the extrajudicial statements of the defendants.

Joseph Sankus testified that he and Maycock had been honorably discharged from the Army on August 25, 1938; that they met at the College Inn (also referred to as College Den) about noon of August 26th and spent the balance of the day and evening drinking beer there and at two nearby taverns; that some time in the evening they were sitting at the bar in the College Inn and sending tips to the orchestra with requests to play special numbers, when his attention was called by Maycock to two unescorted girls who were sitting in a booth and smiling at the two men; that he and Maycock entered the booth, talked to the girls and bought them some drinks; that the younger of the two girls suggested they go to another place and dance; that this girl left the table to telephone a friend to take them to the dance; that she returned in about five or ten minutes and told them her friend had arrived; that the party proceeded outside where Sankus and Maycock were introduced to three young men; that one of these men had a roadster; that the seven then got in the

car, Sankus and the youngest girl sitting in front with the driver and the other four sitting in the rumble seat.

Sankus was unable to identify the defendants with any degree of certainty. He stated that the two women defendants "look like the women, but I couldn't say for sure"; that "the youngest girl [Shirley Kaye] looks familiar, but I couldn't say for sure." His identification of defendant McCord as the driver of the car was somewhat stronger but was not positive by any means. He could not identify at all any of the other defendants. He testified that it was quite dark in the College Inn and also at 723 Vallejo Street, where they proceeded after leaving the College Inn. He also stated that he was not drunk and knew what was going on around him. He did identify a fancy steering wheel exhibited to him in the courtroom as being the steering wheel of the automobile in which they rode that night, and further stated that the automobile had "V-8" hub caps; that it was a light-colored car, a roadster, had no top, and had a rumble seat.

Sankus further testified that after leaving the College Den in the automobile they proceeded to a gasoline station where he bought some gasoline; that they then drove to a tavern known as the 723 Club on Vallejo Street in San Francisco; that the place was very crowded; that Maycock and the older girl got mixed up in the crowd; that he couldn't get near the bar; that he ordered drinks and asked the younger girl to get them; that she brought him a drink which was either a Tom Collins or a highball; that he started to drink that drink but that he has no recollection of finishing it; that the next thing he remembers is waking up on a sidewalk about a block and a half from the bar; that the inside of his right cheek was cut; that, "It seemed like I was socked in the jaw"; that where he found himself was on a steep hill in a blind dark street; that he then went through his pockets and found but twenty cents; that he had $10 or $15 when he left the College Den, but as to the exact amount he couldn't say for sure; that he was positive that it was more than twenty cents; that he had more than $5 when he arrived at the 723 Club.

Mrs. Anita Slater testified that she and her husband were driving along Alemany Boulevard between 2 and 2:30 A. M. on August 27, 1938, when she saw a man staggering along the shoulder of the road; that his face was covered with

blood, that they stopped and observed that the man had no hat or shoes; that they placed the man in the car and took him to a nearby service station where an ambulance was summoned and the man was taken away.

Elmer Lohr testified that he was a hospital steward employed by the city; that he accompanied the ambulance to Alemany Boulevard and Bayshore and there picked up the injured man; that the man had no shoes on, nor did he have a hat; that he accompanied the man to the Mission Emergency Hospital; that there were no tears in the man's suit; that the man told him his name was Donald Maycock; that Maycock was bleeding from the nose, mouth and right ear; that he searched the clothing of Maycock, and that he found no property other than a handkerchief.

Dr. Paul Ashton testified that he examined the man in question upon his arrival at the Mission Emergency Hospital; that he had no shoes; that he was conscious and told the doctor he was an army man; that he was bleeding from the nose and mouth, and from the right ear; that he had a bruise behind the left ear; that he had a black eye—the left one; that there was intercranial bleeding; that he had a basal fracture of the skull and was suffering from acute alcoholism; that, in the great percentage of such cases, such a fracture is fatal; that it was his opinion that the man was dying; that he had no other external evidence of injury.

Dr. Ralph Everett Reiner corroborated Dr. Ashton as to the physical condition of the injured man, and, in addition, stated that when he saw him he was turning blue, which indicated that there was a severe brain injury and that the man was dying; that the man had no natural teeth; that the upper dental plate was present but the lower one was missing; that Maycock died at 7:30 A. M. on August 27, 1938.

Dr. Sherman Leland testified that he performed an autopsy upon the body of Maycock; that the cause of death was shock and hemorrhage following fracture of the skull. He corroborated the other doctors as to the general physical condition of the deceased, and testified that Maycock's lower dental plate was missing when he examined him. He further testified that the brain of Maycock was removed and sent to the pathologist connected with the coroner's office.

Dr. Jesse L. Carr, the pathologist, testified that he and his assistant examined the brain of Maycock; that such ex-

amination revealed a severe brain hemorrhage, and a hemorrhage in the brain stem; that the hemorrhage in the brain stem was called a "boxer's hemorrhage"; that such hemorrhage is caused by the fact that at the bottom of the skull there is a large hole through which the brain stem projects down into the spinal canal; that when the muscles are relaxed and a person receives a sudden blow on the face the stem is pinched over the edges of this hole; that the stem hemorrhage found in the brain of Maycock could have resulted from a blow on the chin, jaw or face; that, from his experience, such a hemorrhage could not have been caused from any other type of injury; that he had never seen it occur except from a blow to the face or back of the head; that a person can receive a blow on the jaw or face of sufficient force to cause a "boxer's hemorrhage" without leaving any mark or abrasion on the jaw or face; that the stem hemorrhage which he found in Maycock's brain could not have been caused by anything other than a punch in the face or a blow that would cause a sudden movement of the head; that there was another skull fracture and brain contusion suffered by Maycock which was caused by his head striking some heavy immobile object.

Defendants McCord, Pettingill and Shirley Kaye were arrested on August 29th. McCord's automobile was outside the house where the defendants were arrested, and the steering wheel was the one identified by Sankus in court. The automobile was a Chevrolet, but had Ford V–8 hub caps. McCord took the police to a spot off Alemany Boulevard nearby where Maycock was later found by Mrs. Slater and her husband. At this spot the police found a five-cent piece, a ten-cent piece, a lower dental plate broken in two, and a combination nail file and clippers. Nearby were certain dark spots which Dr. Carr testified contained human blood. Approximately fifty feet from this spot was found a grey felt hat which had on it certain spots which were found to con- tain blood.

Sankus testified that Maycock had false teeth; that he had frequently observed Maycock remove his teeth at night; that the broken dental plate found by the police looked like the dental plate belonging to Maycock, but he couldn't be sure about it. He also testified that the combination nail file and clipper was of the type issued to all enlisted men in the army;

that Maycock had such a file, but he could not identify the particular one as belonging to Maycock. Concerning the hat, he testified that during the afternoon of August 26th he had visited a cleaning establishment with Maycock to get the latter's hat which was being cleaned; that the hat was then not ready but he had observed it on a hat block; that later in the afternoon Maycock secured the hat; that the hat found by the police looked like Maycock's hat.

An employee of the hat cleaning establishment testified that the hat in question had been cleaned in his establishment.

Harold Steiner testified that at about 1 A. M., August 27, 1938, he drove into a gas station on Bayshore Boulevard; that he had previously known McCord and Kaye; that McCord drove in and started putting water in the radiator; that he spoke to McCord; that Pettingill was sitting behind the steering wheel; that a girl, other than Shirley Kaye, was in the front seat with two men he did not know; that on that occasion he talked with both McCord and Pettingill.

It is this evidence that appellants claim was insufficient to establish the *corpus delicti* of any of the three offenses of which they were charged. It must be remembered that, so far as this contention is concerned, we are not at this point interested in whether the evidence is sufficient to establish the guilt of the defendants, but simply as to whether the *corpus delicti* was sufficiently proved to permit the introduction into evidence of the extrajudicial admissions of the defendants. We think the evidence is clearly sufficient for this purpose.

The rule as to the *quantum* of proof necessary to establish the *corpus delicti* was stated in *People* v. *Hudson,* 139 Cal. App. 543, 544 [34 Pac. (2d) 741], as follows: ''It is well settled, as appellant contends that the *corpus delicti* must be proved by evidence outside of the declarations and admissions of the defendant; but it is equally well settled that to authorize the reception and consideration by the jury of evidence of extrajudicial confessions or admissions of a defendant, the prosecution is not required to establish the *corpus delicti* by proof as clear and convincing as is required to establish the fact of guilt. Slight or *prima facie* proof is all that is necessary. [Citing cases.]

"It may be proved by circumstances shown in evidence or by inferences drawn from facts shown. (*People* v. *Vicunia,* 105 Cal. App. 145 [286 Pac. 1061]; *People* v. *Ford,* 85 Cal. App. 258 [258 Pac. 1111].) Direct or positive evidence is not essential (*People* v. *Wilkins,* 158 Cal. 530 [111 Pac. 612]), nor is it necessary that such evidence in itself connect the defendant with the perpetration of the offense (*People* v. *Jones,* 123 Cal. 65 [55 Pac. 698]). The decisions hold also that such proof may consist of the testimony of the defendant himself when he voluntarily becomes a witness in the case and testifies to facts which tend to prove the *corpus delicti.* (*People* v. *Kelly,* 70 Cal. App. 519 [234 Pac. 110].) Furthermore, as said in *People* v. *Clark,* 70 Cal. App. 531 [233 Pac. 980], and in the other cases hereinafter cited, while ordinarily it is the proper practice to establish the *corpus delicti* as early in the proceedings of the trial as may be practicable, the order of proof is discretionary with the court, and where the *corpus delicti* is finally established, a mere variation in the order of proof cannot be said to result in any prejudice to the defendant's rights. [Citing cases.]"

In *People* v. *Ives,* 17 A. C. 493, 497 [110 Pac. (2d) 408], the rule is stated as follows: "The *corpus delicti* may be proven by circumstantial evidence, and the reasonable inferences drawn therefrom. To warrant a conviction it must be proven to a moral certainty and beyond a reasonable doubt, but it is not necessary that it should be so proven before other evidence is introduced which corroborates it or strengthens reasonable inferences drawn therefrom. If a *prima facie* case is presented that the deceased met his death by means of an unlawful act of another, the evidence is sufficient. [Citing cases.]"

Tested by these standards, there can be no doubt that the *corpus delicti* of each of the three crimes charged was sufficiently established. Certainly, there was at least "slight" or "*prima facie*" evidence that the three crimes were committed.

Each of the appellants made a statement to the police and each of them took the stand in his or her defense. Of course, the extrajudicial statement of each defendant can be considered only as against that defendant.

Appellant Cirimele, in his extrajudicial statement, stated that he had known Shirley Kaye, Pat Pettingill and William

McCord for some time prior to the night in question; that he first met Laura Bonzani on that night; that at about 9 P. M. on August 26th, he met Pettingill and McCord in the 723 Club; that in about an hour the three men drove to the College Den in McCord's automobile; that on their first visit there they did not meet anyone; that they drove away and returned; that Pettingill went into the College Den and returned with Kaye and Bonzani and with the two men; that they first got some gasoline and then went to the 723 Club and had some drinks; that later in the evening Shirley Kaye took one of the soldiers (Sankus) for a walk, and that Pettingill and he walked behind them; that when they got several blocks from the 723 Club Pettingill knocked the soldier down and he (Cirimele) searched him and took his money; that they then returned to the 723 Club; that later he, Bonzani and the other soldier (Maycock), McCord and Pettingill got into McCord's car and took a ride; that this ride had been arranged beforehand by either Pettingill or McCord; that they stopped at a beer parlor and the soldier bought them a drink; that they stopped at a gas station to get some oil; that they then drove to Alemany Boulevard near Bayshore and pulled off the highway a short distance; that Pettingill was arguing with the soldier; that they got out of the car and Pettingill hit the soldier; that he (Cirimele) searched the soldier while he was lying on the ground; that he doesn't remember if any of the others participated in the searching; that he took three or four dollars from the prostrate body; that they then returned to the 723 Club and spent the money.

On the witness stand he testified as to meeting Pettingill and McCord at the 723 Club and later picking up the two women and the two soldiers at the College Den. He denied that he had participated in the robbery of Sankus. He stated that he had been drinking heavily; that he got sick and took a walk; that later he took a ride; that Bonzani and one of the soldiers sat in front; that he sat in back; that they drove out to Alemany Boulevard and stopped; that Bonzani and the soldier got out of the car; that Pettingill got out; that an argument was going on; that he saw the soldier put up his hands as if about to hit Pettingill; that McCord was with him in the rumble seat; that McCord had "passed out";

that he (Cirimele) never got out of the car at that spot and that he did not rob the soldier.

In the extrajudicial statement of Laura Bonzani she stated that she had known Shirley Kaye and "the rest of them, about one and one-half months"; that she lived with Shirley Kaye; that on August 26th she left her home with Shirley Kaye at about 8 or 8:30 P. M.; that her ex-husband drove them to the College Inn; that during the evening they noticed the two soldiers spending quite a bit of money; that they were "picked up" by the two soldiers; that at about 11 P. M. Shirley phoned the 723 Club and shortly thereafter they all drove to the 723 Club in McCord's automobile; that later she left that club with the three male defendants and with the soldier, later identified as Maycock, in McCord's automobile; that she had said to the soldier, "Let's go"; that they stopped and had a drink at a cafe, and a little later stopped and got some oil at a gas station; that they then drove to Bayshore and Alemany Boulevard; that they drove off the road; that she got out, as did Pettingill and the soldier; that "the first thing I knew Pat Kelly [Pettingill] hit him and he went down"; that McCord and Cirimele then got out of the machine and the three men searched the prostrate soldier; that they then drove a few blocks and stopped; that Pettingill offered her two one-dollar bills as her portion; that she "went to take it and he said, 'We didn't get much out of him', and I said, 'Well, I don't want any' "; that the other two defendants took some of the money; that they then drove her to Gough and Market Streets and let her out of the car; that when the car was stopped at the place where the soldier was hit the lights were turned off; that she couldn't say whether the soldier put up any resistance; that before she left the 723 Club, Shirley Kaye told her about the other soldier being knocked down by Pettingill. She, as well as the other appellants, denied removing Maycock's shoes to see if any money was hidden there.

As a witness, Laura Bonzani corroborated her above statements except in the following important respects. She testified that she met Cirimele, Pettingill and McCord for the first time on August 26th when she rode with them, Shirley and the two soldiers to the 723 Club; that later in the evening she told the soldier that she had an appointment and he offered to escort her to Market Street; that then one of

the "boys" offered to ride her to the appointment; that the soldier and Pettingill got into an argument at the gasoline station over who was to pay for the oil purchased; that they stopped off Alemany Boulevard in order to let her off, and that she walked a short distance in back of the car; that when she got back she discovered there had been a fight; that Pat (Pettingill) told her the soldier got fresh and tried to follow her and that he, Pettingill, had tried to stop him; that they then drove her to Gough and Market where she got out of the car. She denied making many of the statements contained in her extrajudicial statement, and particularly denied knowing about the slugging of Sankus, and denied that she invited Maycock to go on the ride, or that she had stated that the three male defendants searched Maycock and offered to divide the money with her.

Patrick Pettingill, in his extrajudicial statement, stated that he was also known as Pat Kelly; that the statement of William McCord had been read to him up to the point where the party had left the 723 Club; that the statement as read to him was correct; that he had no changes to make in that statement; that after they left the 723 Club the soldier wanted a drink so they stopped at a cafe and had a drink; that they then stopped at a gasoline station and that he and the soldier got into an argument as to who should pay for the oil; that they both wanted to pay for it; that the soldier finally paid; that they got back in the car and the soldier continued the argument; that the soldier stated he was going to punch the witness and made other threats; that he (Pettingill) stopped the car and they both got out; that the soldier put up his hands and so he (the witness) hit the soldier first, "and he fell down and just laid there and he snored laying there like he was asleep"; that they then left him lying there and went down to the Musicians Club. He denied that he or the other defendants robbed the soldier.

As a witness he testified that he and McCord went to the 723 Club some time after 7:30 P. M. on August 26th; that a little later they met Cirimele there; that they had a few drinks and then took a ride to the beach, and some time after 10 P. M. returned to the 723 Club; that Shirley Kaye's sister told him and McCord that Shirley was down at the College Den and wanted them to pick her up; that he couldn't find Shirley at the College Den; that they returned to the 723

Club and then returned to the College Den; that this time McCord went in and returned with the two girls and the two men; that that was the first time he had met Laura Bonzani; that they stopped at a gas station and Sankus bought some gasoline; that the whole party proceeded to the 723 Club; that they all had some drinks; that Laura Bonzani told him she had a date and he offered to drive her down town; that they got into the car and the soldier Maycock wanted him to drive out to Colma; that he agreed to do so. The balance of his story, as told on the witness stand, is substantially similar to his extrajudicial statement, except that he stated that the reason he drove out Alemany Boulevard was to get an overcoat at his home, and that the reason he stopped is that Laura stated she wanted to stop; that he turned off the lights to assure Laura of privacy. He also stated that the soldier started to follow Laura Bonzani and that he (Pettingill) protested; that the soldier swore at him and hit him; that he struck back and the soldier fell. He also stated that after leaving Laura out of the car on Market Street the rest of the party proceeded back to the 723 Club and then went to the Musicians Club. He denied robbing either Sankus or Maycock.

Shirley Kaye, in her extrajudicial statement, stated that she had known McCord and Pettingill for about two and one-half years; that on the evening of August 26th she phoned from the College Den to the 723 Club and talked to McCord and asked him to come over and get her; that she met a girl at the College Den; that the two soldiers came over to the booth where she was sitting; that after she phoned to McCord he called for her, and the party rode over to the 723 Club; that the soldiers were ''buying everybody in the place drinks and were dancing quite a bit''; that she left the 723 Club at about quarter to two and went to the Musicians Club; that she didn't know whether the soldiers were still there when she left; that the soldiers spent about $10 while they were, with her and her party. In this statement she did not mention the names of Laura Bonzani or of Cirimele.

On the witness stand she stated that Laura Bonzani lived in the same building with her; that she had known her for a month and a half; that she and Laura Bonzani visited together that evening and planned to go out together; that they left the house together and a friend of Laura Bonzani's rode

them down to the College Inn; that they remained there for a short period and that the two soldiers came to their booth and bought some drinks; that the soldiers suggested they go some place to dance and she suggested the 723 Club; that she phoned her sister at that club, but she wasn't there so she told whoever answered the phone to send someone with a car over to pick her up at the College Inn; that shortly thereafter McCord came over; that she introduced him to Bonzani, whom he had never met before, and to the soldiers; that they, together with Cirimele and Pettingill, rode over to the 723 Club in McCord's car; that they all were drinking and dancing; that Sankus had at least six straight whiskies; that she remained at the club until about ten minutes to two and did not leave during that time; that at that time she, McCord, Pettingill and Cirimele went to the Musicians Club and stayed there a few hours and had quite a few drinks. She denied taking a walk with Sankus. She testified that she handed Sankus no drinks during the evening, and did not give him any knock-out drops. She denied making all portions of her extrajudicial statement inconsistent with her testimony on the witness stand.

Defendant McCord made several extrajudicial statements to the police, the last one implicating all of the defendants in a preconceived plan to have the girls pick up some drunks and then the male defendants would "roll" them for their pocketbooks. McCord, however, refused to take the stand as a prosecution witness, so that his statements were only admissible against himself, and, since he is not appealing, should not be here considered.

The court admitted into evidence as against appellants Pettingill, Cirimele and Kaye, over their objections, the testimony of one Chong Hin, a Chinaman. He testified that in the early morning hours of August 25th (two days before the events here involved occurred) he visited the 723 Club; that he started to leave that place and walked to the corner when he was assaulted by three men and thrown in a car. He positively identified Pettingill and Cirimele as his assailants, but could not identify the third man. He testified that Pettingill hit him so hard he broke the witness' gold teeth; that they knocked him unconscious and drove him to Pier 43; that a gold watch and $7 were taken from him. He identified a particular watch as the one taken from his per-

son. The evidence also showed that the watch was pawned the next day by Shirley Kaye under the name of Mrs. J. Kirkpatrick, the address being given as 809 Noe Street. Appellant Kaye admitted pawning the watch, stated that her former name was Kirkpatrick and that she formerly lived on Noe Street. She stated she had found the watch on the floor at the 723 Club. This evidence was clearly admissible as against these three appellants.

■ All of the appellants urge that the evidence is insufficient, as a matter of law, to sustain their respective convictions. Before the convictions may be reversed on this ground the evidence must be in such a state that this court can hold that upon no hypothesis whatever is there sufficient substantial evidence to support the conclusion reached by the jury and the trial judge. This fundamental rule is stated as follows in *People* v. *Tom Woo*, 181 Cal. 315, 326 [184 Pac. 389] : "For it is the function of the jury in the first instance, and of the trial court after verdict, to determine what facts are established by the evidence, and before the verdict of the jury, which has been approved by the trial court, can be set aside on appeal upon the ground we are discussing it must be made clearly to appear that upon no hypothesis whatever is there sufficient substantial evidence to support the conclusion reached in the court below.''

■ The evidence is clearly sufficient to establish that Sankus was robbed. The extrajudicial statement of Cirimele establishes his connection with that offense. The circumstances surrounding that offense, and the facts herein recited, raise the inference that this robbery was part of a preconceived plan on the part of all defendants to rob men under the influence of liquor. The testimony of the Chinaman establishes that appellants Kaye, Pettingill and Cirimele had participated in another crime of similar nature.

The evidence establishes that Maycock met his death from a blow in the face inflicted by Pettingill, in the presence of Bonzani, Cirimele and McCord, and that he was thereafter robbed. Although there is no direct evidence that this blow was not struck in self-defense, as testified to by the appellants, the surrounding circumstances, and the facts herein recited, justified the jury in inferring that such blow was struck as part of a preconceived plan to rob. Clearly, there was no intent to kill, but that, of course, is not necessary

when the killing occurs in the commission of a robbery. The inconsistencies and direct contradictions between the extra-judicial statements of the respective appellants and their testimony on the witness stand, and the inconsistencies and contradictions in their testimony, were matters that the jury could properly consider. The jury was also entitled to indulge in reasonable inferences based on the evidence.

█ Shirley Kaye urges ,that the evidence was insufficient to convict her of the murder and robbery of Maycock. Admittedly, she was not present when Maycock was slugged by Pettingill, but was then still at the 723 Club. However, when the circumstances of the "pick up" at the College Den are considered, her participation in the Sankus robbery, and her past connection with Cirimele and Pettingill in the robbery of the Chinaman, it is our opinion that the jury was reasonably entitled to infer that the two girls started out to "pick up" the two soldiers for the ultimate purpose of robbery to be committed by their male associates. The evidence supports the inference that she did not accompany the group that robbed and slugged Maycock in order to account for the absence of Sankus with whom she had been all evening, and who had already been slugged and robbed. Under such circumstances, the evidence was sufficient to sustain her conviction of the two offenses under discussion.

█ Appellant Bonzani urges that her motion for a separate trial should have been granted. This contention seems to be predicated on the contention that there was no evidence before the grand jury to indicate that she had been involved in the robbery of Sankus. While it is true that the jury acquitted her of that charge, had she been convicted the evidence would have been sufficient to sustain the conviction for the same reasons that it is sufficient to sustain the conviction of Shirley Kaye on the charges involving the murder and robbery of Maycock. The defendants were all properly charged in the same indictment with the three crimes alleged to have been jointly committed by all defendants. Having been properly charged their joint trial was proper (Pen. Code, secs. 954 and 1098). The doctrine of *People* v. *Davis,* 42 Cal. App. (2d) 70 [108 Pac. (2d) 85], has no application to this case. In that case, by separate indictments, different defendants were charged with separate and distinct crimes alleged to have been committed against different persons at

different times. In the instant case, there was but one indictment charging all of the same defendants with the same offenses alleged to have been committed against the same persons at the same times.

The judgments and order appealed from are affirmed.

Knight, J., and Ward, J., concurred.

A petition for a rehearing was denied April 15, 1941.