[Crim. No. 4884. In Bank. Sept. 3, 1948.]

THE PEOPLE, Respondent, v. ROBERT F. MEHAFFEY, Appellant.

Richard J. Weller and James R. LeGallez for Appellant.

Fred N. Howser, Attorney General, and Henry A. Dietz, Deputy Attorney General, for Respondent.

SPENCE, J.—Defendant was charged by information with the murder of Lewis David Edds on or about April 11, 1947, in the county of San Bernardino. He entered the dual pleas of not guilty and not guilty by reason of insanity, but then withdrew the latter plea following the report of the appointed medical examiners stating their findings and conclusions that

defendant was ''sane at the . . . time'' of their examination and likewise ''was sane at the time of the commission of the alleged crime.'' Thereafter defendant was tried and the jury returned a verdict of guilty of murder in the first degree, without recommendation. In due course a motion for a new trial was interposed by defendant and denied, whereupon judgment of death was pronounced upon him. The appeal is automatic under the provisions of subdivision (b), section 1239, of the Penal Code.

As grounds for reversal, defendant makes the following contentions: (1) that his confessions and extrajudicial statements were admitted without establishment of the corpus delicti; (2) that there was no showing of the voluntariness of his confessions; (3) that a certain photograph, identifying him with particular surroundings, was introduced as an exhibit without authentication; (4) that negative evidence offered by him with regard to the failure to make earlier discovery of the deceased's body was improperly excluded; (5) that hearsay testimony—as to oral declarations made by the deceased and others in the presence of defendant—was received in evidence over his objections; and (6) that the district attorney was guilty of misconduct in his closing argument to the jury. Careful examination of the entire record, with especial attention to the various issues raised by defendant and their consideration in the light of applicable principles of law, compels the conclusion that defendant's assignments of error are without merit. A general statement of the facts and circumstances in evidence will suffice before discussing defendant's contentions as above enumerated.

On April 11, 1947, Lewis David Edds disappeared. Following arrest almost four months thereafter and confession of the crime here charged, defendant on August 18, 1947, led a searching party—as will be discussed hereinafter to a body (identified later as Lewis David Edds) in a wash drain in desert terrain about 42 feet north of the road known as the Victorville-Palmdale cut-off, some 2½ miles west of Highway 66, in the county of San Bernardino. Some brush and twigs partially obstructed the view of the body from the roadway. The autopsy performed that day revealed that the body was badly decomposed in consequence of protracted exposure to the desert sun and weather, and that death had resulted from several bullets having pierced the bony structure of the deceased's chest.

The sequence of events material to the charge against defendant appears from the record to be as follows: On April 7, 1947, defendant was hitch-hiking from Los Angeles along Highway 66. About 11 o'clock in the morning, when he was some 15 or 20 miles east of San Bernardino, he was picked up by the deceased, who was driving alone in his Plymouth sedan. The deceased was planning a vacation trip on the desert, where he had gone in previous years and knew many persons, and the back seat of his car was packed with camping equipment and other belongings, including a loaded six-cartridge gun in a holster. At approximately noon that day the deceased and defendant reached the town of Ludlow, where they stopped because the deceased was having trouble with his car. After several hours' delay waiting for the repairs to be completed, they drove some 8 miles south to the Bagdad-Chase Mine, arriving before dusk. Friends of the deceased, Mr. and Mrs. Donald Love, operated the mine and maintained cabins there, one of which was assigned to the deceased and defendant. After a few days there, with a considerable part of the time spent in visiting at the Loves' home, the deceased and defendant about 8:30 or 9 o'clock on the morning of April 11, left the mine and drove to Barstow, arriving about noon. There they visited an automobile agency, where the deceased spoke about his car trouble to one of the employees, Gustav Harris, and arranged for the purchase of a used 1941 De Soto sedan in exchange for his Plymouth and $1,500 cash, which sum—plus $100 for vacation expense— the deceased withdrew from the Barstow bank after proper identification was made. Upon advice of the bank's assistant cashier handling the matter, Stewart Davidson, a bill of sale was then prepared, signed by Harris, and given to the deceased; a copy of which document was introduced in evidence. Defendant was present with the deceased on all these occasions and witnessed the various transactions involved.

Defendant helped the deceased pack the back seat of the De Soto car with the latter's belongings transferred from the Plymouth sedan, and then they drove some 12 miles in the late afternoon to the town of Calico. There they stopped at the home of Larry Coke, a friend of the deceased, and had several drinks of whiskey mixed with coca-cola, defendant taking but one to the others' three because "he was doing the driving." Coke testified that in the course of their conversation, the deceased stated that "they were going to camp"

on the desert for some "six or eight days," and that as the deceased and defendant left about 5:30 o'clock that afternoon on their way "to Yermo to eat," the deceased added "I will see you after while," but that he never saw the deceased again.

After having dinner at Yermo, the deceased and defendant started to return to Calico. En route they became aware of "a gasoline odor somewhere in the car," and they "stopped to try to locate" it. In the course of their investigation on the road, defendant suddenly took the deceased's gun from the back of the car and shot the deceased "once from the back" and "two or three" times from the side-front as the deceased was falling to the ground. It was then about 8 or 9 o'clock in the evening. Defendant wrapped the body in a pair of old pants so as not to get blood on the car, placed it in the front seat, and after driving down various roads looking for a suitable place of concealment, he finally deposited the body where it was later found in the wash drain off the Victorville-Palmdale cut-off as above recited. Before abandoning the body, defendant took the deceased's watch, ring, and wallet, and then placed some brush and weeds over the remains as a partial cover.

Thereupon defendant drove the deceased's car to Los Angeles and registered at a hotel for the night. The following morning, April 12, he pawned the deceased's watch at a jewelry shop, under the name of "L. D. Edds." That night he drove to San Francisco, where he stayed for several days. He spent a considerable part of the time in various bars on Third Street, where he introduced himself as Lewis D. Edds, showing certain documents and papers which he had found among the deceased's belongings, including the latter's bankbook, gun permit, credential card from the Bethlehem Steel Company stating the deceased to be a guard there, and a number of $25 war bonds "made out to L. D. Edds." Most of the bonds defendant cashed during his stay in San Francisco. Defendant also disposed of the deceased's diamond ring at one of the bars for $100 worth of drinks, and he pawned a rifle that he had found among the deceased's effects. In addition, defendant sold the deceased's car for $1,100 to one Julius Weinrob. The bill of sale covering the latter transaction was introduced in evidence, showing defendant's execution of that document as "L. D. Edds." Weinrob took possession of the car and paid defendant $100 to bind the

sale, with the balance due on receipt of the ownership certificate, which then was in transit to Sacramento in consequence of the deceased's purchase negotiations at Barstow as above mentioned. The camping equipment, gun holster, and a camera were left in the car upon its sale to Weinrob and were never reclaimed by defendant. Both the gun holster and the camera were identified at the trial as belonging to the deceased, and they were introduced as exhibits.

About April 19, defendant left San Francisco by bus and proceeded to Nebraska and Texas, visiting relatives at various places along the way. At one of his stops in Nebraska he sold the gun with which he had allegedly shot the deceased, and disposed of the last two war bonds. In early August a bank in Lampasas, Texas, on defendant's order, sent in a draft together with the deceased's bankbook to the Los Angeles bank where the account was kept, in an effort to secure certain money there on deposit. The draft was returned "unpaid." Finally on August 6, 1947, defendant was arrested at Dallas, Texas, by a secret service agent for having forged the deceased's name on the war savings bonds that he had cashed— some 30 or 32 in all. On August 9, two deputy sheriffs from San Bernardino County—Officers Manning and English— arrived at Dallas, Texas, and interviewed defendant in the sheriff's office there. At first defendant denied any knowledge of the crime, stating that he had obtained the deceased's property—the war bonds, watch, car, and other personal effects —as the result of a "strong-arm" robbery in Los Angeles, but after some preliminary questioning defendant admitted his guilt of the homicide and made a confession of the details thereof substantially in accord with the above outline. Defendant was then returned to California in the company of the two officers and incarcerated in the jail at Barstow. The following days defendant spent traveling about the desert with the officers searching for the body of the deceased, and finally in the morning of August 18, 1947, it was discovered in a wash drain off the Victorville-Palmdale cut-off as above noted.

Thereafter defendant made further statements acknowledging his commission of the crime: one in the afternoon of August 18 in the presence of the district attorney of San Bernardino County and the two officers charged with his custody; another in giving testimony on August 21, at his preliminary hearing and arraignment in the Justice's Court of Yermo; and still another on the occasion of his examination

by a secret service agent on August 28, relative to the forgery of the deceased's bonds. These three last-mentioned statements, together with the confession made by defendant on August 9, in Texas, were admitted in evidence, and they all agree in their essential detail of chronology with the sequence of events as heretofore outlined. In so confessing to the homicide, defendant gave robbery as his sole motive, his desire to gain possession of the deceased's belongings, the value of which he had learned from their association and conversation during their four days together on the desert, April 7 to 11. Defendant, who was 37 years old, had suffered previous criminal convictions: in Kansas for grand theft and forgery; and in this state for petty theft, with a prior conviction, for which he was sentenced to serve a term in the state penitentiary.

At the trial defendant's association with the deceased on the desert between April 7 and 11, was described at length by the several persons above noted as having seen them together in that interim on various occasions—business and social—and these respective contacts were similarly identified by defendant in the course of his repeated confessions and statements to the law enforcing authorities. However, defendant completely repudiated that phase of his previous narrative when he took the witness stand on his own behalf, maintaining that he had not been outside of Los Angeles County at any time between April 7 and 12, 1947, and that he had no knowledge whatever of the homicide in question. In line with such change of position, defendant testified to this chronology: On April 7, he was in Glendale at the home of his future wife and her family; April 8, 9 and 10, he spent in Los Angeles going to various bars, attending picture shows, and "knocking about" town in general; on April 11, he borrowed a dollar from a certain bar attendant, Fred Shaw, and with that money he went to Long Beach, where he visited a friend, Wylie Moffett, who operated a bar there, and then returned to Los Angeles in the late afternoon. In the evening of April 11 he went to Gus' Bar, where he met two "casual acquaintances," one of whom he had known at Folsom, and at their suggestion he agreed to help "roll" a man—about 30 or 35 years old—who was then standing at the bar and was "pretty intoxicated." They carried through their plan when their intended victim went to the rest room, knocking him unconscious and then taking all his personal effects—including his wallet, watch, "everything that was in his pockets," car keys and parking ticket. They got the victim's automobile—a 1941 De Soto—

from the parking lot, found in the back of the car his bankbook and war bonds bearing the name "Lewis D. Edds," and then they "split up" for the night, defendant taking the car with him. The next morning they met again, defendant pawned the watch using the name of Edds, and then they drove to San Francisco, arriving about 7 or 8 o'clock in the morning of April 13. They registered at different hotels, and after defendant. cashed some of the bonds the next day and divided the proceeds with his partners, he never saw them again. From that point defendant's account at the trial coincided in the main with the above recital of succeeding events after arrival in San Francisco on April 13, until his arrest in Dallas, Texas, on August 6.

On behalf of defendant, there was somewhat vague and confused testimony from the Los Angeles hotel clerk and his wife as to defendant's presence on the premises between April 5 and 12; from defendant's future in-laws as to the time he allegedly spent at their home in Glendale on April 7; from the bar attendant, Fred Shaw, from whom defendant claimed to have borrowed the dollar for his trip April 11 to Long Beach, and from the bar owner, Wylie Moffett, whom he assertedly visited that afternoon. Defendant's purported two companions on the occasion of the related robbery in Gus' Bar during the evening of April 11 were not called as witnesses to substantiate that happening, and the proprietor of the bar testified that no such disturbance occurred on the premises during that day or night. Confronted with this sharp conflict in the evidence as to defendant's whereabouts and activities during the critical period of April 7 to 11, the jury, in finding defendant guilty of the murder charge in question, apparently accredited the sequence of events for that interval as outlined in defendant's successive confessions and corroborated by the prosecution's witnesses pertinent to that branch of the case.

■ (1) As his first ground for reversal, defendant contends that the corpus delicti was not proved, and that therefore evidence of his confessions and extrajudicial statements was erroneously admitted. Specifically he challenges the sufficiency of the proof—"exclusive of [his] purported confessions and admissions"—to establish (a) the identity of the body found as Lewis David Edds and (b) the cause of death as the criminal act of another. To this point he properly refers to the settled rule that the corpus delicti must be proved by evidence outside of the extrajudicial declarations and statements of a defendant. (8 Cal.Jur., Criminal Law, § 248, p. 167;

*People* v. *Kaye,* 43 Cal.App.2d 802, 809 [111 P.2d 679];
*People* v. *Seymour,* 54 Cal.App.2d 266, 275 [128 P.2d 726].)
But it is likewise well settled that to authorize their
reception in evidence and consideration by the jury, the prose-
cution is not required to establish the corpus delicti by proof
as clear and convincing as is necessary to establish the fact of
guilt; rather slight or prima facie proof is sufficient for such
purpose. (8 Cal.Jur., Criminal Law, § 303, p. 234; *People* v.
*Bollinger,* 196 Cal. 191, 200 [237 P. 25]; *People* v. *Selby,* 198
Cal. 426, 437 [245 P. 426]; *People* v. *Ives,* 17 Cal.2d 459, 463
[110 P.2d 408]; *People* v. *McMonigle,* 29 Cal.2d 730, 738 [177
P.2d 745].) It may be proved by circumstantial evi-
dence and by inferences reasonably drawn therefrom. (8
Cal.Jur., Criminal Law, § 248, p. 167; *People* v. *Vicunia,* 105
Cal.App. 145, 147 [286 P. 1061].) Direct or positive evidence
is not essential (*People* v. *Wilkins,* 158 Cal. 530, 536 [111 P.
612]; *People* v. *Peete,* 54 Cal.App. 333, 347 [202 P. 51]; *Peo-
ple* v. *Clark,* 70 Cal.App. 531, 545 [233 P. 980]), nor is it
necessary at this point to connect the defendant with the per-
petration of the offense (13 Cal.Jur., Homicide, § 68, p. 676;
*People* v. *Meyers,* 7 Cal.App.2d 351, 354 [46 P.2d 282]; *Peo-
ple* v. *Cowan,* 38 Cal.App.2d 231, 240 [101 P.2d 125, 135];
*People* v. *Wade,* 71 Cal.App.2d 646, 654 [163 P.2d 59]).
Tested by these principles, the sufficiency of the proof of the
corpus delicti here is not open to dispute.

As above stated, the body of the deceased was found on the
morning of August 18, 1947, in a wash drain near the Victor-
ville-Palmdale cut-off by a searching party which included
defendant and the two mentioned deputy sheriffs having
charge of his custody—Officers Manning and English. Upon
being notified of the discovery, the deputy coroner, Edward
P. Doyle, and the autopsy surgeon, Dr. Chauncey Baird, pro-
ceeded to the place on the road where the body was located
and a preliminary examination of the remains was there
made that day. The autopsy revealed that the body, which
was fully clad as found, had probably lain exposed to the
desert sun for a considerable period of time. The clothing
was "markedly bleached," and putrefaction had affected the
remains. There was decomposed flesh and skin on the body,
but "the bony structures were all intact and in position."
The "internal organs," "blood," "eyes," and "soft tissues"
of the body "were largely destroyed, presumably [by] the
insects and weather" as the result of the prolonged desert

exposure. Upon removal of the clothing, "the skin on the front of the chest" from "the neck . . . down to the waist-line" was found to be comparatively well preserved.

In giving his findings with respect to the condition of the body, Dr. Baird testified as follows: That "a round hole" located "on the left side of the front of the chest"—"very sharply outlined" and "quite different than the other holes that had been produced by insects or weather"—and a corresponding hole "on the back" slightly "below the tip of the right shoulder blade," with "the splintering of [the] rib *outward*" between those points, indicated the rib fracture to have been caused "by some object passing through it from the interior to the exterior"; that immediately under this area in the back there was another "sharp round hole the same size as the one . . . found in the front of the body" except in that instance "the splintering of the rib was *directly inward*," showing that the penetrating object that broke that rib passed "from the outside inward," and cut a groove along the right side of the spine at the level of the broken rib, but that no point of exit in such line of travel was located; that in his opinion such perforations in the skin and rib fractures had "the characteristics of a bullet injury"; that a lead bullet from the left chest and a portion of the skin thereof, "including the [bullet] opening [there] found," were removed and delivered by him to the deputy coroner (each of which specimens was introduced in evidence as exhibits by the prosecution); that from his examination it appeared that one of the bullets could have passed "through the chamber of the heart" or "through the right lung," necessarily resulting in a "very severe hemorrhage," and causing death; that from his experience, it was possible for a person to shoot himself more than once "if the first wound was not fatal," but that he had never seen a case of a man putting a gun in his back and shooting himself through the spinal column, as one of the bullets here appears to have been directed.

After completion of the autopsy, the body of the deceased was removed to a mortuary in San Bernardino. The next day, August 19, Edward R. Edds went to the funeral parlors to view the remains. In the presence of the deputy coroner, Mr. Doyle, he positively identified the body as that of his brother, Lewis David Edds, a man 61 years old, upon recognizing a tattoo mark on the deceased's right forearm—"an emblem of a pick and shovel." At the trial he testified that it was some "35 years ago," when he was "about the age of 16 or 17,"

that he first saw the tattoo mark on his brother's arm, that the "outlines [were] clearly visible" to him, that he was "looking for that particular mark" when he identified the deceased, and that he was "positive and sure" that the body he so saw at the mortuary was his "brother, Lewis David Edds." The deputy coroner corroborated this testimony as to the existence of the tattoo mark on the deceased's right forearm, describing the outline as "faint" but "distinguishable," though he could not detect exactly "what was represented" until "told what it was supposed to be."

██ Defendant complains that the prosecution "glozed" over many possible identifying features, such as considerations of the clothing, teeth, hair, height, approximate build, fingerprints, and blood type tests of the deceased. But the evidence showed that the remains were badly deteriorated in many respects, that there was but little hair remaining on the head, that the blood was gone, and there was general disfigurement as the result of putrefaction and decomposition of large areas of the skin. While some dentures were removed from the deceased's mouth, the prosecution could not be required to include them in the identifying proof, since such showing would only constitute cumulative evidence to the ample identification of the body made by the brother's "positive" recognition of the tattoo mark on the deceased's arm. (Cf., *People* v. *Peete, supra,* 54 Cal.App. 333, 346-347.) As was said in *People* v. *Clark, supra,* 70 Cal.App. 531, at page 542: "No universal and unvariable rule can be laid down in regard to the proof of the *corpus delicti*. Each case depends upon its own peculiar circumstances. The body of the crime may be proved by the best evidence which is capable of being adduced, if it is sufficient for the purpose."

██ To prove a prima facie case of the corpus delicti here, all that was necessary was to show a reasonable probability that the deceased was the man alleged to have been killed— Lewis David Edds—and that he met his death by means of the unlawful act of another. The evidence above reviewed on this point readily supports such conclusion to "the exclusion of every other reasonable hypothesis" (*People* v. *Clark, supra,* 70 Cal.App. 531, 542), and since such evidence was introduced prior to the admission of defendant's confessions and extrajudicial statements, the trial court justifiably viewed it as ample in quantity and quality to meet the most exacting requirements of the law for establishment of the corpus delicti. ██ But irrespective of this fact of preliminary

showing of the essential elements of the corpus delicti, "there would have been no error since order of proof is discretionary with the court and, where corpus delicti is finally established, a mere variation in the order of proof cannot be said to result in any prejudice to the defendant's rights." (*People* v. *Seymour, supra,* 54 Cal.App.2d 266, 275.)

▇ (2) Nor does it appear, as defendant vigorously urges, that there was an absence of a showing of the voluntariness of his confessions as a foundation for their admission in evidence. The rule is well settled that " [b]efore a confession is admissible it must be shown by the prosecution that it was voluntary, and made without any previous inducement or by reason of any intimidation or threat." (*People* v. *Jones,* 24 Cal.2d 601, 608 [150 P.2d 801].) ▇ But whether a confession is of that character is a preliminary question addressed to the trial court (*People* v. *Castello,* 194 Cal. 595, 599 [229 P. 855] ; *People* v. *Lisenba,* 14 Cal.2d 403, 421 [94 P.2d 569] ; *People* v. *Triplett,* 70 Cal.App.2d 534, 538 [161 P.2d 397] ), and a considerable measure of discretion must be allowed that court in determining it (*People* v. *Ellis,* 33 Cal. App.2d 616, 621 [92 P.2d 431] ; *People* v. *Sourisseau,* 62 Cal. App.2d 917, 930 [145 P.2d 916] ). ▇ The mere fact that the confession was made to a police officer or other officer of the law while the accused was under arrest does not necessarily render it involuntary and inadmissible. (*People* v. *Gonzales,* 24 Cal.2d 870, 875 [151 P.2d 251] ; *People* v. *McEvers,* 53 Cal.App.2d 448, 451 [128 P.2d 93].) Application of these principles negatives the force of defendant's objections to the admission of his confessions.

As above narrated, defendant was arrested on August 6, 1947, in Dallas, Texas. The record reveals that four written confessions were obtained from defendant: the first on August 9, at the Dallas County Jail before police officers from both California and Texas; the second on August 18, in the district attorney's office in San Bernardino following the discovery of the body on the desert; the third on August 21, at the preliminary hearing in the Justice's Court of Yermo Township with respect to the charges filed against defendant; and the fourth on August 28, in the San Bernardino County Jail in response to questioning of a secret service agent relative to defendant's forgery and negotiation of the war savings bonds registered to the deceased. Claiming that these confessions were not freely or voluntarily made but were the result of extortion, punishment, physical torture and abuse, defendant

took the witness stand at the trial and testified at length. In particular, he maintained that at the time of his first interview with the officers on the evening of August 9, he was questioned for several hours as to his commission of the alleged murder; that he steadfastly denied any knowledge of such homicide but did admit that he "and two other fellows in Los Angeles robbed a man in a bar"; that upon his continued disavowals of their charge, the officers "beat" and "kicked" him "in the back," "knocked him from one to another," causing him to become "unconscious several times"—when Officer Manning would grind the heels of his boots into defendant's throat after he fell to the floor and then upon his being "picked up and put in a chair," Deputy District Attorney Krumm (one of prosecution counsel herein) would hold defendant's hair while Manning "struck him" in the face "until he lost consciousness" again; that they kept "pounding questions" at him, saying that "they already had the body" and "evidence" as to many of the details establishing his guilt but they "wanted his story"; that after he "could take no more" of such inhuman treatment, he said "You ask the questions and I will say 'yes' to all of them"; that when "they had the necessary answers Mr. Krumm left the office and came back with a confession typed for him to sign," which after "read[ing] it over . . . he did." Defendant further testified that as the result of such beating by the officers, he "received two partially cracked ribs, a partially cracked shoulder blade, and bruises on his back and shins" as well as a "heel mark on his throat" from Manning's boots and "cuts" on his forehead; that during his trip from Texas to California in the custody of Officers Manning and English, he was frequently queried about various phases of the alleged murder and warned that he could "make it rough" or "make it easy" for himself, depending on the type of story he chose to tell after he arrived in California; that after he was placed in the Barstow jail on August 14, he was told that he would get "no cigarettes or water until the body was found," and that he was then "taken to different localities" on the desert "for search"; that when he was taken to the district attorney's office in San Bernardino on August 18, following the discovery of the body, "he was told by Manning to make the same statement he had made before or what he got in Texas wouldn't be anything to what he would get if he didn't"; that because of these threats and the fear engendered in him as the result of the described Texas beatings, he made the three subsequent

purported confessions—August 18, before the district attorney at the latter's office, August 21, before the committing magistrate at the preliminary hearing in the Yermo Justice's Court, and August 28, before the secret service agent in the local jail—although on none of these three occasions did he suffer any abusive treatment.

To corroborate his story of the physical beatings he had experienced in the Texas grilling, defendant produced these witnesses at the trial: (a) two fellow prisoners in the San Bernardino County Jail, one of whom said that on ''August 21'' he saw ''a bruise over [defendant's] eye'' and ''black and blue marks'' on his legs and back, and the other said that ''sometime between August 20 and 30,'' when he ''saw . . . defendant in [the prison] tank,'' his face appeared to be ''all right'' but that there were some ''skinned places and bruises on his legs from the knees down''; (b) a photographer, who allegedly took pictures of defendant's body on August 30 at the jail and who stated that ''there were bruise marks on the body both front and back'' but that he could not detail their appearance; and (c) defendant's sister-in-law, who stated that when she visited defendant at the jail in August, she saw ''a skinned place across his forehead'' and ''some bruised places on his leg.''

It is obvious that if the foregoing testimony on behalf of defendant stood uncontradicted in the record, it would have been error to have admitted in evidence his several confessions. But such recital is sharply refuted by those present at the taking of the successive statements from defendant—in particular by the officers in question, who specifically testified that at no time were any threats, promises or mistreatment of any kind used in obtaining the enumerated confessions—as well as by other evidence material to the consideration of the various points in issue. Officer Manning expressly testified that on no occasion—either in Texas, en route to California, or while defendant was in his custody after arrival here— did he, or any one in his presence, strike, beat, kick or otherwise commit any bodily injury on defendant; that at no time did he advise defendant to continue to tell ''the same story . . . that he told in Texas [or] he could expect the same treatment, or words to that effect''; that on August 18, after he had brought defendant's breakfast to the jail, and they were preparing again to undertake another trip to locate the body on the desert after several days already spent in fruitless search, defendant said: ''Art [Manning], there ain't no use

of horsing you around any more, I thought maybe if I horsed around when you took me to San Bernardino I could get an attorney and get out on a Writ, but I might as well go and show you where the body is''; that after the body was found later that morning, defendant voluntarily, and without threats of any kind, made his confession in the afternoon to the district attorney; that on their way ''back to Barstow,'' he said to defendant, ''Bob, why don't you go ahead and have the whole thing over?'' and defendant replied ''it was a good idea, he would have the preliminary trial and arraignment''; that thereafter, and without any inducement, coercion or intimidation, defendant freely testified before the committing magistrate in the Yermo Justice's Court; and that at the coroner's inquest, which was held later, defendant did not take the stand and he was not urged to do so. Officer Manning further testified that on the occasion of defendant's first confession in Dallas, the questioning consumed ''approximately an hour,'' that he [Manning] was wearing ''cowboy boots'' but at no time did he grind his ''boot heel on [defendant's] throat,'' nor did he then tell defendant that they ''had already found the body'' or ''would produce one.''

Sheriff Fred Mason of Lampasas County, Texas, who was present at the taking of defendant's first confession in Dallas, testified that at the outset of the interview, Officer Manning confronted defendant with various details of incriminating evidence as to his disposition of the deceased's automobile and other property at different places in California; that defendant at first denied knowing ''anything in particular about the set-up,'' but after being shown a photograph of himself standing in front of one of the cabins, allegedly taken while defendant and the deceased were staying at the Bagdad-Chase Mine between April 7 and 11, and remarking, ''That is a poor picture of me,'' defendant said, ''Well I will tell you where the body is''; that defendant then made his confession, that neither Officer Manning nor any one else in the room subjected defendant to any mistreatment, and after signing his statement, defendant left ''in the same condition physically as when he came in the room.'' Officer English, who was also present at the Dallas questioning of defendant on August 9, corroborated the other two officers in all particulars as to the fair conduct of that interview. While he did admit that he ''probably'' reported ''by phone'' some time that evening to the '' [San Bernardino] Sheriff's office'' that ''the accused after several hours of severe grilling had broken

down and signed a confession," such statement would be open to interpretation and would not, as defendant argues, necessarily signify the use of "third degree" methods in extracting the confession. On the contrary, as was said in *People* v. *McEvers, supra,* 53 Cal.App.2d 448, at page 451, the fact "that the accused ha[s] been interrogated many hours does not render his statements involuntary." In so confessing after his initial grilling, defendant may well have decided that "the officers already had possession of [many of] the facts and he could gain nothing by refusing to" admit the charges. (*People* v. *Gonzales, supra,* 24 Cal.2d 870, 874; see, also, *People* v. *Triplett, supra,* 70 Cal.App.2d 534, 538.)

The Texas confession purports to have been "freely and voluntarily made," upon advice that "any statement" therein made could "be used in evidence against" defendant "on the trial," and it details defendant's commission of the crime as outlined in the forepart of this opinion. Defendant's confession on August 18 before the district attorney after the discovery of the body likewise purports to have been made "of [defendant's] own free will and accord," and after full information as to his "constitutional right" not to be a witness against himself. The same observations prevail with respect to the full and complete advice of "his rights" given to defendant on the occasion of his preliminary hearing on August 21, and his subsequent confession on August 28, as to his forgery and negotiation of the deceased's war savings bonds. Photographs taken of defendant at various overnight prison stops from Texas en route to California were introduced in evidence to show that defendant had no bruises or scratches on his throat or forehead, as he claimed to have sustained during the Texas interview as above related. Of similar import are the recitals of the district attorney of San Bernardino County as to his observation of defendant on August 18, and the secret service agent as to August 28—that at these respective times defendant had no visible bruise marks and made "no complaints" as to the treatment that had been accorded him. Also material to this issue is the testimony of an officer of the "Bureau of Identification," who was in the room at the above mentioned taking of the photograph of defendant on August 30, during his imprisonment in the local jail—that he saw no bruises or discolorations on defendant's body at that date other than a red mark on his back left by the buckle of a safety belt which prisoners wear, and that the person who claimed at the trial on behalf of defendant

that he had taken the photograph of defendant's body on the day in question, and had noticed "bruise marks on the body both front and back," was in fact not present on that occasion, but that another photographer had taken the pictures.

From this review of the pertinent portions of the record, it is manifest that the matter was fully developed in the trial court, with defendant having every opportunity to present his position, and that the question whether the written confessions were freely and voluntarily made became one of fact for the trial court to determine in the first instance from considerations of evidence which sharply differed on practically every point. (*People* v. *Castello, supra,* 194 Cal. 595, 600; *People* v. *Black,* 73 Cal.App. 13, 17-18 [238 P. 374]; *People* v. *Sourisseau, supra,* 62 Cal.App.2d 917, 931.) As an added factor there is the alleged oral admission of guilt made by defendant to one Elmer Leake, a truck driver, who was a member of the searching party of August 18. After identifying various photographs that were taken of the scene of location of the body as found that day in consequence of checking various "washes" because defendant had said that "he knew it was a spot something like [that] where the body was laying," Leake testified that upon the party's return to the "Sheriff's office in Victorville," he and defendant sat alone in the car while Officers Manning and English "went to make a phone call." At that time he stated that he asked defendant "if he killed Edds at Calico, then rode him in the car, took him clear over there, and he said, yes, he did, that he didn't know why he carried him so far as that, but he guessed he was scared and in a hurry and he guessed he wanted to get away from the scene as quick as he could and get shed of him." While at the trial defendant claimed that he talked to Leake only about his truck-driving job, the latter expressly stated that the conversation was not so limited. Thus again it was a question for the trial court to determine which testimony to accept, and apparently defendant's recital was not accredited so that his oral as well as written confessions became correlating evidentiary considerations in the case. Coincident with these observations is the testimony of the various witnesses above mentioned on behalf of the prosecution as to the continued association of defendant and the deceased on the desert between April 7 and 11, all dovetailing with the detailed account of the sequence of events outlined in the several written confessions given by defendant. Moreover, in addition to

this independent proof of defendant's presence at the scene of the crime, the jury was carefully instructed that "although the court [had] admitted evidence tending to show that defendant made a confession," such circumstance must be disregarded entirely "unless you, yourselves, by your own weighing of all the evidence, your own judging of the credibility of witnesses, and your own reasonable deductions, conclude that the alleged confession not only was made, but was voluntary"; and that a confession is not of such character "when it has been obtained by any kind or degree of violence, abuse or threat, or by any direct or implied promises of immunity, leniency or other benefit." Thus, not only did the trial court upon conflicting evidence determine in the first instance the matter of the free and voluntary nature of defendant's several confessions, but the jury in its deliberations likewise reached the same result in its final analysis of the question under the court's charge, and the issue as so resolved against defendant will not be disturbed on appeal. (*People* v. *McEvers, supra,* 53 Cal.App.2d 448, 451; *People* v. *Sourisseau, supra,* 62 Cal.App.2d 917, 931.)

(3) Defendant next contends that the trial court admitted in evidence a certain photograph without authentication, but the record does not sustain his position. According to the testimony of Mr. and Mrs. Donald Love, who operated the Bagdad-Chase Mine and maintained living accommodations there, the photograph portrayed one of their cabins where defendant and the deceased allegedly stayed on the desert from April 7 to 11. Defendant was purportedly shown standing in the foreground. It appears that the photograph was part of the roll of undeveloped film found in a partly loaded camera discovered among other personal effects of the deceased in the back of the car which Weinrob purchased from defendant in San Francisco as above related. Weinrob so identified the camera and related its delivery to a San Francisco police inspector in the course of the latter's examination of the trunk of the car as a link in the incriminating evidence against defendant. In corroboration thereof, the police officer at the trial, after fixing the time of his so obtaining the camera as "near the end of August, 1947," stated that "under his supervision and control," the "film was developed and printed in the police laboratory," and that the photograph in question was "one [thus] developed." It further appears that defendant in his confession of August 18, before the District Attorney of San Bernardino County, when questioned about

this particular photograph, stated that "it was taken at the Bagdad Mine" on "the second day" he and the deceased "were there," that he remembered that he "stood there and the old man [the deceased] took [his] picture," and "when [he] sold the car in San Francisco [he] forgot about the picture being in the camera." Furthermore, as above recited, the Texas sheriff who was present on the occasion of the interview of defendant at Dallas, Texas, on August 9, testified that defendant, when confronted with this photograph by the investigating officers, said "That is a poor picture of me," and following this admission, defendant made his confession.

In this state of the record establishing the source of the film and the authenticity of the representation, there can be no doubt as to the sufficiency of the foundation for the admission of the photograph in evidence. As was stated in *People* v. *Doggett*, 83 Cal.App.2d 405, at page 409 [188 P.2d 792] : "The general rule is that photographs are admissible when it is shown that they are correct reproductions of what they purport to show. This is usually shown by the testimony of the one who took the picture. However, this is not necessary and it is well settled that the showing may be made by the testimony of anyone who knows that the picture correctly depicts what it purports to represent." (See, also, *Berkovitz* v. *American River Gravel Co.*, 191 Cal. 195, 201-202 [215 P. 675].)

(4) Likewise without merit is defendant's complaint that the trial court committed prejudicial error in its exclusion of "negative evidence" to the effect that persons living in the vicinity and passing along the highway near where the body was found, partly decomposed after alleged exposure on the desert for some four months, had neither through their sense of sight or smell detected its presence. The record discloses that the court excluded such line of testimony from witnesses on behalf of defendant on the ground that the fact one "driving down the highway" did not observe the body located a distance therefrom, and concealed at least in part by bushes and twigs, "doesn't prove it wasn't there"; that such situation is "different" from one where the proffered testimony would establish that the "witness had been down there and inspected the spot and it [the body] wasn't there." The distinction so drawn by the court coincides with the general rule that negative evidence lacking in probative value is properly excluded as too speculative in nature. (31 C.J.S., Evidence, §165, p. 875; 1 Jones' Commentaries on Evidence (2d ed.),

§§ 20-22, pp. 33-39; *State* v. *Smith* (Mo.), 222 S.W. 455, 459; *People* v. *Kennedy*, 267 Mich. 430 [255 N.W. 405, 407].) So pertinent in support of the court's ruling is the argument advanced by the prosecution that "odd odors on a country road do not normally" provoke an "investigation" and the photographs in evidence, showing the locale involved, indicate the "area of road was isolated, open," conducive to "[automobile] travel at high speed" and containing "nothing . . . which would necessarily invite attention to a spot some 40 feet from the road itself where the body laid."

But recognizing that objections to such class of evidence ordinarily go to its weight rather than to its competency (8 Cal.Jur., Criminal Law, § 177, p. 76; 32 C.J.S., Evidence, § 1037, p. 1079 et seq.; 2 Jones' Commentaries on Evidence (2d ed.), § 601, p. 1112), and assuming that the negative testimony here in question was admissible though of slight importance (2 Wigmore on Evidence (3d ed.), § 664, p. 777; *People* v. *Crespi,* 115 Cal. 50, 56 [46 P. 863]), its exclusion could not reasonably have affected the jury's consideration of any issue of guilt against defendant. Such negative testimony is relevant only as determined by the surrounding circumstances and where, as the record here indicates, the fact of the deceased's long exposure on the desert may well have occurred though unperceived by the ordinary passer-by, who, not having his attention directed to the matter, in all likelihood would be concerned with other affairs, its probative force would be practically nil. In any event, such proffered testimony on behalf of defendant certainly would not, as he maintains, be of sufficient weight to overcome the inference that the body found on August 18, 1947, was that of the deceased Edds as so positively identified in proof of the corpus delicti, and its exclusion is in nowise classifiable as "prejudicial error denying to the accused his right to a fair trial." (See Cal. Const., art. VI, § 4½.)

(5) Nor may defendant prevail in his objection to the trial court's admission of declarations made by the deceased and others in his presence prior to the time of the alleged murder. At this point defendant specifically complains of testimony adduced by the prosecution from the following witnesses: (a) Mr. and Mrs. Donald Love, and Larry Coke— all friends of the deceased— who related various conversations they respectively had with the deceased between April 7 and 11, 1947, at the time he allegedly was on the desert, when he mentioned his immediate camping plans and his intent to

purchase a new automobile; (b) Gustav Harris, who was the seller of the 1941 De Soto car to the deceased and who related the latter's conduct of negotiations in the matter; and (c) Stewart Davidson, who was the banker assisting in the financing of the car transaction and who related different phases of the deceased's participation in that arrangement. Each of these witnesses testified that defendant was present on the enumerated occasions. Defendant objects to such testimony as constituting "hearsay," and likens it to "accusatory statements," which, though made in his presence, would only be admissible as "evidence of the conduct of the accused in the face of such accusations." (*People* v. *White*, 44 Cal.App.2d 183, 186 [112 P.2d 60]; see, also, *People* v. *Philbon*, 138 Cal. 530, 532 [71 P. 650].) But manifestly since this challenged testimony concerned statements and declarations made prior to the alleged homicide, it cannot be correlated with any accusations of guilt against defendant, and the quoted rule on that type of proffered evidence is not in point. Rather these considerations suggest themselves in support of the admission of the testimony in question: (a) to show defendant's association with the deceased and his knowledge of various matters handled by the deceased during their stay on the desert from April 7 to 11, as opposed to defendant's alibi testimony that he was never in that locale during that period; (b) to show further the identity of defendant as the man the witnesses saw in the deceased's company; and (c) to show the deceased's purpose with respect to purchase of a car, having the intent to make a certain camping trip and then return—all as part of the res gestae reflecting the course of material events. (8 Cal.Jur., Criminal Law, § 190, p. 92; anno. 113 A.L.R. 268, at p. 275, and cases cited; *People* v. *Fong Sing*, 38 Cal.App. 253, 257-259 [175 P. 911]; *People* v. *Shannon*, 28 Cal.App.2d 677, 680 [83 P.2d 302].) Accordingly, the propriety of the court's admission of the testimony in question is not open to dispute.

(6) Finally to be considered is defendant's claim of misconduct on the part of the district attorney in his closing argument, which, it is urged, was so grave as to prejudice defendant in the eyes of the jury and operated "to deny to him a fair trial." Defendant's charge is without substantial basis. It appears that in his closing remarks, the district attorney referred to certain statements made by defendant's counsel in the latter's summation of the case before the jury as being without the evidence when, in fact, such observations

were no more than the recital of details contained in defendant's several confessions as introduced by the prosecution. Defendant argues that by so incorrectly alluding to defendant's counsel as being in possession of facts which were not embraced in the record, the district attorney intimated that defendant had made a confession, not before the court, and that his counsel was improperly trying to bring parts thereof before the jury. While the argument of defendant's counsel is not reported, apparently from the text of his closing remarks the district attorney was merely reiterating evidentiary points made by defendant's counsel and confusedly queried "where did he [defendant's counsel] get his information."

Presumably the jury knew the contents of defendant's several confessions as contained in the record, and the district attorney's momentary failure to recall their full scope demonstrated no more than a slip of memory on his part and could not reasonably be regarded as an attempt to mislead or confuse the jury as to the source of the recited evidentiary details. Such harmless error would certainly constitute no ground for reversal (Cal. Const. art. VI, § 4½), and irrespective of the impropriety of defendant's argument here, in view of the fact that at no time in the course of the district attorney's closing argument did he assign the now challenged remarks as prejudicial or request an instruction that they be disregarded. (8 Cal.Jur. Criminal Law, § 521, p. 508; *People* v. *Marvich*, 44 Cal.App.2d 858, 863 [113 P.2d 223]; *People* v. *Gray*, 52 Cal.App.2d 620, 658-659 [127 P.2d 72]; *People* v. *Shack*, 55 Cal.App.2d 16, 22 [130 P.2d 197].) The situation in nowise parallels that prevailing in *People* v. *Podwys*, 6 Cal. App.2d 71, 75-76 [44 P.2d 377], where the objectionable remarks were of such character that their effect "could not have been obviated by any instructions to the jury," or in *People* v. *Westcott*, 86 Cal.App. 298, 319 [260 P. 901] where the district attorney indulged in argument showing "a persistent disregard . . . of the directions and admonitions of the court" and manifesting "a complete departure from the spirit of fairness which should animate the conduct of [such] officer." On the contrary, here it appears that defendant was fairly tried and under the evidence was justly convicted.

The judgment and the order denying the motion for a new trial are affirmed.

Gibson, C. J., Shenk, J., Edmonds, J., Carter, J., Traynor, J., and Schauer, J., concurred.