[Crim. No. 5790.    Second Dist., Div. Three.    July 15, 1957.]

THE PEOPLE, Respondent, v. PETE GONZALES MISQUEZ, Appellant.

Gray, Glass, Allen & Ransom for Appellant.

Edmund G. Brown, Attorney General, and Bonnie Lee Hansen, Deputy Attorney General, for Respondent.

SHINN, P. J.—Pete Gonzalez Misquez was charged by information with the murder of Margaret Ann Rafferty. Trial was to the court, which found him guilty and determined the offense to be murder of the first degree. (Pen. Code, § 189.) Defendant's motion for a new trial was denied and he was sentenced to confinement in the state prison for life. He appeals from the judgment and the order denying him a new trial.

There was evidence of the following facts. Defendant met Mrs. Rafferty in June 1955 and commenced living with her a few months later. In February 1956, they moved to a second story apartment at 7610 Miramonte Boulevard in Los Angeles where they resided together with Mrs. Rafferty's four minor children: Martha, aged 7, David, aged 5, Helen, aged 4, and Margaret Ann, the deceased, who was 2½ years of age. Margaret Ann weighed 30 pounds and had suffered during the winter from whooping cough. She had not fully recovered from her illness by March 1956 and was described by several witnesses as a tired, listless child who was often picked upon and roughly treated by her elder sister Helen. She also bruised easily, but no more than was usual for a girl of her age.

Mrs. Rafferty had a daytime job and was away from the apartment on weekdays from about 7:30 a. m. until after 5 p. m. Defendant began working on the swing-shift in February 1956 and left for work around 3 p. m. During January and February, defendant's sister, a Mrs. Rojas, took care of the Rafferty children at her own home while their mother was at work. She told defendant on Saturday, March 3rd, that she could no longer do so.

In the late morning of the next day, Sunday, March 4th, Mrs. Rafferty's brother paid a visit to his sister's apartment. He saw Margaret Ann sitting on the living-room couch with defendant while the other children were playing inside the apartment. She got up only once while he was there. He saw nothing abnormal about the way she walked and there were no bruises on her body, although she was wearing a dress at the time.

Mrs. Rafferty put Margaret Ann to bed Sunday evening. She saw some bruises on the girl's body but they were the bruises she usually received from playing with the other children. When her mother left for work at 7:30 the next morning, Monday, March 5th, Margaret Ann was asleep on the living-room couch and Mrs. Rafferty did not awaken her.

Defendant and the other children were still in the apartment. Sometime during the morning, Mrs. Rafferty was called at work by the school authorities who told her to take Martha home from school because she had measles. Mrs. Rafferty brought Martha home shortly before noon; defendant was somewhere in the apartment and Margaret Ann was playing in the living-room. The child did not seem to be ill and Mrs. Rafferty left after a few minutes, returning soon after 5 p. m. Defendant was not at home when she returned and Margaret Ann was lying on the bed in the bedroom. When she went to awaken her daughter, Margaret Ann was unconscious and appeared to be asleep. Mrs. Rafferty picked her up but was unable to arouse her. She did not examine the child, but promptly called for help. It was established that death occurred at 6:13 that evening.

Dr. Frederick J. Newbarr, the Los Angeles County Coroner's chief autopsy surgeon, qualified as an expert witness. He testified that he performed an autopsy upon Margaret Ann's body the next morning, Tuesday, March 6th. The child's trunk, neck and limbs were covered with reddish discolorations and she had contusions on her lips. There were scratches on her abdomen and her buttocks were also severely discolored. There was a reddish-brown discoloration which entirely circled her scalp. Several photographs showing the condition of Margaret Ann's body at the time of the autopsy were introduced in evidence.

Dr. Newbarr discovered indications of bronchial pneumonia which might have been 48 hours old at the time of death but the disease was not far enough advanced to have been a cause of death. He attributed the child's death to traumatic intracranial hemorrhage and ecchymosis (or hemorrhage) in the mesentery of the mid-abdomen; in other words, (a) a hemorrhage between the dura and the arachnoid, the outer and inner coverings of the brain, extending over both hemispheres and into the base of the brain; (b) a hemorrhage in the apron of tissue which attaches the intestine to the posterior abdominal wall.

The reddish-brown discoloration of the under-surface of the child's scalp indicated to Dr. Newbarr that her head had been suddenly projected against some hard object or that a hard object had suddenly struck her head; the reddish-purple discoloration of her abdominal tissue gave the same indications. The witness was shown a stick which was used by Mrs. Rafferty to dip clothes out of the washing machine;

it was about 15 inches long, an inch wide, and 5/16ths of an inch thick. He stated his opinion that a blow from the edge and flat side of the stick, delivered with sufficient force by a grown man, could have precipitated the subdural hemorrhage; a blow from the stick could also have caused the abdominal injuries, particularly if the stick were used in a plunging manner. The latter injuries could also have been produced by blows with a stick or by throwing the child against a steel post. In Dr. Newbarr's opinion it was unlikely that the injuries could have been caused by a fall down a flight of stairs (the Rafferty apartment had two short flights of stairs), because they were produced by a sudden contact; the injury to the child's abdomen might possibly have been caused by a severe kick from a playmate.

Dr. Newbarr was asked to estimate the age of Margaret Ann's injuries at the time of her death. He stated that her head injury could have been 24 hours old, or somewhere between 24 and 48 hours old; it looked older than 6 hours and he could not tell its precise age with the range of 12 to 24 hours. He also stated that the injury to her abdomen was probably not over 24 hours old; it could have been a day old but he did not exclude the possibility that it was inflicted much more recently. He thought that it was older than 3 or 4 hours but that it could have occurred around 3 p. m. on Monday if the child had been forcibly thrown against a steel post at that time.

Charles McGowan, a Los Angeles County sheriff's deputy, was the investigating officer in the case. He testified that at about 8 p. m. on Monday he went to the Firestone Station where defendant and Mrs. Rafferty were in custody. He obtained a key to the apartment and went there with Martha, who pointed out a stick and said: "This is the stick that Pete beat the little girl with." McGowan also found a rubber exerciser. Both objects were received in evidence.

While he was in custody, defendant made a statement in the presence of Deputy McGowan and a shorthand reporter. McGowan testified that defendant was not promised any reward or immunity for making the statement, that no force was used or threatened, and that defendant's statement was freely and voluntarily made. The substance of defendant's statement is as follows. He stated that he took Martha to school around 9 a. m. on Monday. When he returned to the apartment he saw that Margaret Ann had wet the living-room couch. He took a stick and struck her three times on the

buttocks. She fell on the floor and he told her to get up. When she did not comply he caught her arm, swung her in the air with his left hand, and struck her repeatedly for about 5 minutes with the stick; Margaret Ann was crying during this time. He hit her on the head, stomach, chest, back and legs with the flat side and edge of the stick. When he was through he put the stick on top of the television set. After that he sent her to the bathroom and gave her some clean panties. He then left her inside the apartment and went out to wash his car. He visited his sister's home and returned at 3 p. m. to pick up the children and take them there. He saw Margaret Ann walk out of the apartment and fall on the hallway stairs next to the bathroom. He seized her by the neck, shook her and slammed her into the edge of the bed. She fell on the floor. He picked her up and slammed her into the other side of the bed; she landed against the steel bedpost and lay still, shutting and opening her eyes. Misquez threw some covers over her, left the apartment and went to work. He said that he did not take the children to his sister's house because he was afraid that his sister would be suspicious if she saw the condition of the child. When he returned home at 6 p. m. after being called by Mrs. Rafferty he did not tell her what had happened because he did not think it was serious. He did not call a doctor because he was afraid the doctor would call the police. He stated that he had beaten Margaret Ann with the stick on previous occasions, beginning about a month before her death. He hit her with the rubber exerciser the day before she died. He gave her a bath on Sunday and noticed bruises on her trunk, legs, arms and face. When asked by the officers whether Mrs. Rafferty knew he was beating the child he said that he always bathed and dressed the girl, so her mother probably never saw the bruises. He admitted that he had also struck Helen and David with the stick. He especially disliked Margaret Ann because of Mrs. Rafferty's attentions to her; she was the only one her mother petted and Mrs. Rafferty gave her more affection than he or the other children received. He got no satisfaction from striking Margaret Ann but he thought that if he beat her he would be getting even.

Defendant took the stand in his own defense. He testified that he gave the child a bath on Sunday and noticed some bruises on her body but he did not beat her the following day. He spanked her on the buttocks with the stick and tapped her on the head when she wet the couch but he did not hit her hard.

Before he left for work in the late afternoon he played with her, throwing her in the air and tossing her gently on the bed; he did not intend to hurt her. He did not take the children to his sister's house on Monday because she told him she couldn't take care of them any more. He did not give the officers permission to search the apartment after he was arrested; he gave the key to a deputy with instructions to hand it to a Mrs. Baker, the baby-sitter, who was at the police station with his sister. He made up the confession because McGowan told him that if he confessed Mrs. Rafferty would be released from custody. On cross-examination he said that he lied to McGowan about hitting the child and slamming her against the bed in order to account for the bruises on her body, which had been there for a long time; he admitted picking her up and whipping her with the stick and that he did not call a physician on Monday afternoon because he was afraid the doctor would contact the police.

Defendant's attack on the judgment is first directed to the admissibility of the confession. It is argued that evidence of his extrajudicial statements should not have been admitted for the reason that the prosecution failed to establish the corpus delicti. In this connection Misquez urges that the evidence did not negate the possibility that Margaret Ann died as the result of an accident rather than by criminal means. This argument cannot be maintained.

■ In a murder charge the corpus delicti consists of two elements: the death of the alleged victim and the existence of some criminal agency as the cause. (*People* v. *Cullen*, 37 Cal. 2d 614, 624 [234 P.2d 1], and cases cited.) ■ The corpus delicti must be proved by evidence independent of the extrajudicial statements of the accused. But, as a prerequisite to the reception of a defendant's extrajudicial statements in evidence, the corpus delicti need not be established by proof as clear and convincing as is necessary to establish guilt. (25 Cal.Jur.2d 510-513, and cases cited.) ■ The corpus delicti need only be shown by some evidence, and a prima facie showing that the alleged victim met death by a criminal agency will suffice. (*People* v. *Corrales*, 34 Cal.2d 426, 429 [210 P.2d 843] ; *People* v. *Mehaffey*, 32 Cal.2d 535, 545 [197 P.2d 12], and cases cited.) ■ Furthermore, the corpus delicti may be established wholly by circumstantial evidence and by inferences reasonably derived therefrom. (*People* v. *Corrales, supra,* 34 Cal.2d 426, 429 ; *People* v. *Mehaffey, supra,* 32 Cal.2d 535, 545.) And such evidence need not connect defendant with the

commission of the crime. (*People* v. *Amaya,* 40 Cal.2d 70, 76 [251 P.2d 324].)

■ It is undisputed that Margaret Ann's body was covered with bruises and that death was caused by violent blows to her abdomen and head occasioned by sudden contact with a hard object. The question for the trier of fact was whether the blows occurred through an accident, a fall or kick, or were unlawfully administered. It was the autopsy surgeon's opinion that the child was not likely to have sustained such severe injuries while acting by herself and that an accidental fall would account neither for the nature of the blows nor for the existence of the many bruises on her body. It was also his opinion that the injuries to her head and abdomen could have been caused by blows from the stick and that the latter injury could have been caused by throwing the child against a bedpost.

*People* v. *Bonilla,* 114 Cal.App.219 [299 P. 784], involved a similar question. In that case the defendant was accused of murdering his wife and objection was made to the introduction of his extrajudicial statements on the ground that the corpus delicti had not been established. Evidence which tended to show that the fatal injuries were due to a blow on the head from a blunt instrument rather than to an accidental fall from an automobile was held sufficient to show the corpus delicti. The medical evidence in the present case which tended to show that Margaret Ann's injuries were not inflicted accidentally is at least as compelling as that in the Bonilla case. We cannot say that there was an insufficient prima facie showing that her death was due to a criminal agency.

■ It is next contended that the admission of defendant's confession was error for the reason that it did not connect him with the fatal injuries and hence did not relate to the offense charged. Misquez admitted to the officers that he gave the girl a severe beating about 9 o'clock on Monday morning and slammed her against the bedpost about 3 o'clock the same afternoon. This was evidently the theory of the prosecution. He now argues that Dr. Newbarr's testimony fixed the time when she sustained the fatal injuries as at least 24 hours prior to her death, i.e., sometime on Sunday. Reasoning from this premise, defendant urges that admissions that he struck the child on Monday are wholly unrelated to the causes of death. The argument is untenable.

There was testimony by various persons who saw Margaret Ann over the weekend that she was in her normal condition on Saturday and Sunday and that she did not have the terribl⸲

bruises disclosed by the autopsy photographs. Dr. Newbarr testified that the intracranial and abdominal hemorrhages could not be precisely dated, and although he stated that both injuries could have been 24 hours old at the time of her death, he did not rule out the possibility that they were inflicted on Monday. He gave his opinion that the abdominal injury could have occurred as late as Monday afternoon. The medical testimony in this regard was to be considered together with that of the other witnesses and the resolution of uncertainties in the doctor's testimony was a question of fact for the determination of the trial court. (*People* v. *Newland,* 15 Cal.2d 678 [104 P.2d 778].)

There is no substance to defendant's claim that the confession should have been excluded because it contained admissions that he had struck the deceased on previous occasions. These admissions were clearly relevant in proving defendant's disposition and intent.

Another assignment of error to be considered is that the court erred in receiving in evidence the stick and rubber exerciser which the investigating officer recovered from the apartment. It is conceded that Deputy McGowan did not have a warrant and did not have the express permission of Misquez or Mrs. Rafferty to make the search. It is argued that in the absence of such permission the evidence was obtained through an unlawful search and seizure. The argument is without merit.

The officer testified that he did not remember asking either defendant or Mrs. Rafferty for the key to the apartment. He obtained the key from either defendant's sister or Mrs. Baker, the baby-sitter, who were together at the police station. He told them that he wanted to search the apartment and neither woman objected to giving him the key. Defendant and Mrs. Rafferty were in custody at this time. Although defendant testified that he did not consent to a search he asked that the key be given to Mrs. Baker, and it is reasonable to assume that he wanted her to have access to the apartment so as to look after the children. Mrs. Baker could reasonably suppose that possession of the key gave her some control over the premises and that she was authorized to permit the officer to enter. It was also reasonable for the deputy to suppose that since Mrs. Baker had the key she had the authority which she purported to have, and it was not unreasonable for him to act accordingly. Since he acted in good faith and with her per-

mission in making the search, the evidence obtained thereby was not to be excluded because he might have made a mistake as to the actual extent of her authority. (*People* v. *Gorg*, 45 Cal.2d 776 [291 P.2d 469]; *People* v. *Caritativo*, 46 Cal.2d 68 [292 P.2d 513].) Moreover, defendant admitted having struck the child with the stick, which had also been identified by Martha as one defendant had used on the child. There was no error and there could have been no prejudice in receiving the stick in evidence.

The principal assignment of error is the insufficiency of the evidence to sustain a conviction of first degree murder. In this connection defendant reiterates his contention that there is no evidence connecting him with the infliction of the fatal injuries; what we have already said on this point is sufficient. The question remains whether the evidence supports the court's finding that the killing was perpetrated by means of torture.

■ Where a killing is perpetrated by means of torture, the means used is conclusive evidence of malice and premeditation and the crime is murder of the first degree. (Pen. Code § 189; *People* v. *Duggan*, 61 Cal.App.2d 379 [143 P.2d 88]; *People* v. *Murphy*, 1 Cal.2d 37 [32 P.2d 635].) ■ It is murder by torture where the intent of the accused was to inflict grievous pain and suffering upon his victim, either for the purpose of revenge, extortion, persuasion, or to satisfy some sadistic impulse. (*People* v. *Daugherty*, 40 Cal.2d 876 [256 P.2d 911]; *People* v. *Martinez*, 38 Cal.2d 556 [241 P.2d 224], and cases cited.) Suffering alone is not sufficient to establish murder by torture, for suffering is involved in every violent death brought about by criminal means; there must be an intent that the deceased shall suffer. (*People* v. *Caldwell*, 43 Cal.2d 864 [279 P.2d 539].) This intent may be inferred from the condition of the deceased's body and the admissions of the accused.

The brutal and revolting manner in which defendant mistreated the child leads inevitably to the conclusion that he intended to cause cruel pain and suffering. In *People* v. *Murphy, supra*, 1 Cal.2d 37, evidence that the defendant struck his wife with a belt, a belt-buckle and his fists in such a manner as to fracture her jaw and bruise her entire body was held sufficient to support a verdict of first degree murder upon the theory that the crime was perpetrated by means of torture. There was a similar holding in *People* v. *Gilliam*, 39 Cal.2d 235 [246 P.2d 31], where the defendant repeatedly struck, kicked and gouged a fellow prisoner in a jail cell. Defendant does not suggest that the beatings were administered upon sud-

den impulse or in the heat of passion. We are of the opinion that the evidence fully supports the finding that the offense was murder of the first degree.

The judgment and order are affirmed.

Wood (Parker), J., concurred.